UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:02-CV-298-BO(3)

MICHAEL MOHAN,                          )
                              Plaintiff, ) **MEMORANDUM OF LAW IN SUPPORT OF**
                                         ) **PLAINTIFF'S MOTION FOR SUMMARY**
          vs.                            ) **JUDGMENT AND IN OPPOSITION TO**
                                         ) **DEFENDANT'S MOTION TO DISMISS, OR IN**
COLORALL TECHNOLOGIES                    ) **THE ALTERNATIVE, MOTION TO TRANSFER**
INTERNATIONAL, INC.                      ) **AND TO STAY PROCEEDINGS**
_____Defendant.   )

## FACTS

In September, 2000, Plaintiff first read an advertisement appearing in the News & Observer classified section. The advertisement contained the following language, "$2,500/wk, draw to start + car. Local managing partner for National Co. Full training & support $65,000 investment required". Call Gil 800-316-6507." A true and exact copy of the advertisement is attached hereto and incorporated herein as Exhibit "1." Several weeks later, Plaintiff noted that the advertisement remained in the newspaper and decided to make additional inquiries.

Following several telephone conversations with representatives of Defendant, each of which occurred while Plaintiff was located in North Carolina, Plaintiff was informed that he would need $65,000.00 as working capital and that he would be provided with a car for his use in the business. He was further informed that he would need to fly to Florida to meet at the corporate office for further discussions. Lodging and a rental car were promised. Plaintiff thought that the business involved would be a distributorship and asked if he would have to service accounts. He was informed that the business was looking for a manager to oversee the business in North Carolina and that the business would not take up 100% of his time. Plaintiff was again informed that in order to receive additional information, he would have to come to Florida and that he would be fully reimbursed for his travel expenses, except for the cost

1

of airfare.

On November 2, 2002, Plaintiff received, at his home in North Carolina, a letter via facsimile which was on ColorAll Technologies International, Inc. letterhead providing, among other information, directions to the hotel. This was the first information Plaintiff was provided which indicated the name of the entity offering the business opportunity. Plaintiff reviewed ColorAll Technologies' website prior to flying to Florida.

In Florida, Plaintiff was picked up at his motel by Jerry Prigal, who identified himself as CEO and President of ColorAll. During the course of the day, Plaintiff was introduced to technicians and managers operating within the ColorAll system in Florida. Each individual he met shared with Plaintiff their experience as to the profitability of the system. Throughout the meetings, no one expressed dissatisfaction with the system or represented that they were not making a profit within the system.

During meetings at the ColorAll corporate offices, Plaintiff was not provided with any written materials regarding ColorAll, but he did meet the co-founder of ColorAll, Gil Rosenbrier. As Plaintiff was being dropped off at the airport, Mr. Rosenbrier handed Plaintiff a generic UFOC (Uniform Franchising Offer Circular) for the company.

In on-going negotiations following Plaintiff's return to North Carolina, Mr. Rosenbrier informed Plaintiff that ColorAll was looking for someone to manage a specific North Carolina territory for them. At this time, a discussion ensued as to what would be necessary to organize the business, the Sixty-Five Thousand and no/100 Dollars ($65,000.00) investment was again mentioned, and it was represented to Plaintiff that he would recoup his investment within one year. Representations were made that ColorAll would set Plaintiff up, would supply three technicians, would get accounts set up and train the people, and that ColorAll would do this for three months. Plaintiff was told that he could take the $2,500.00 per week draw, plus a car allowance of $300.00 per month for a "nice" car. Direct representations were made that, after a three month period, Plaintiff would be grossing $20,000.00 per month. Mr. Rosenbrier stated that

2

they had already sold out two of the three territories in North Carolina. The Greensboro-Triad area was still available. Plaintiff put down $5,000.00 earnest money to hold position.

In subsequent conversations with Mr. Rosenbrier, Plaintiff requested financial information on ColorAll, but Mr. Rosenbrier said that he could not release any of that information because it was "private" information. Mr. Rosenbrier did provide Plaintiff with the name of the manager for the Raleigh/East territory.

Plaintiff learned that the Greensboro area had previously been operated, but that ColorAll bought the territory back at fifty (50%) percent of its value. Mr. Rosenbrier informed the Plaintiff that it was normal for ColorAll to repurchase a franchise and that ColorAll works with all clients on repurchases by reimbursing the full value, less expenses, including training costs.

At no time during these negotiations was Plaintiff ever supplied with a Disclosure Statement which made any reference to the State of North Carolina.

Before signing the Agreement, Plaintiff verified with Mr. Rosenbrier, that a profit was assured or he would be able to re-sell the business to ColorAll. Plaintiff then executed the agreement in North Carolina, and pursuant to directions from ColorAll, forwarded the document to the headquarters in Florida for ColorAll's signature.

Subsequently, Plaintiff experienced a myriad of difficulties including the quality of the technicians provided by ColorAll, incomplete training, and inadequate support. Plaintiff approached ColorAll about selling the business back to ColorAll and was re-buffed. Plaintiff then made demand to void the contract and filed a lawsuit seeking enforcement of the remedies contained in the North Carolina Business Opportunity Sales Act (N.C. Gen. Stat. §§66-94, *et. seq.*).

3

# ANALYSIS

## I.

### IS PLAINTIFF ENTITLED TO SUMMARY JUDGMENT?

"To prevail on a motion for summary judgment, [Plaintiff] must demonstrate that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Hagan v. McNallen, 62 F.3d 619, 623 (4th Cir. 1995).

The North Carolina "Business Opportunities Sales Act" ("BOSA") defines a "business opportunity" as:

> the sale or lease of any products, equipment, supplies or services for the purpose of enabling the purchaser to start a business, and in which the seller represents:
>
> ...
>
> (3) The seller guarantees that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity; or that the seller will refund all or part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller, if the purchaser is unsatisfied with the business opportunity and pays to the seller an initial, required consideration which exceeds two hundred and no/100 dollars ($200.00); or
>
> (4) That it will provide a sales program or marketing program which will enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity, provided that this subsection shall not apply to the sale of a marketing program made in conjunction with the licensing of a federally registered trademark or a federally registered service mark, or when the purchaser pays less than two hundred and no/100 dollars ($200.00).

N.C. Gen. Stat. §66-94(1991).

In Martin v. Pilot Industries, 632 F.2d 271 (4th Cir. 1980), the Court faced similar facts as exist in the instant matter inasmuch as the promotional materials for Pilot Industries contained claims about the effectiveness of its training programs, anticipated profit, and the likelihood of success. The Court, interpreting BOSA, held that:

> There is no reason to interpret the words "guarantees" and "income" as used in this statute in other than their ordinary, plain meanings, and there is indeed no suggestion that they

4

should be. It is also apparent to us, as it presumably was to the district court, that under the statute, whether particular representations do guarantee income must be assessed with reference to their objective manifestations rather than to any undisclosed subjective intentions of the person making them. While the objective manifestation of particular words might present a genuine issue of fact due to their intrinsic or contextual ambiguity, we do not think that these do. Here both the express representations made and the context in which they were made are not in dispute, and we agree with the district court that as a matter of law they could convey to a reasonable person situated as was Martin but on impression - that income was being guaranteed.

Martin v. Pilot Industries, 632 F.2d at 275.

A seller of business opportunities who falls under the umbrella established by N.C. Gen. Stat. §66-94, must comply with the provisions of BOSA. N.C. Gen. Stat. §§66-94, *et. seq.*(1994). Those requirements include: (a) compiling and providing to prospective purchasers a disclosure statement comporting with the standards established in N.C. Gen. Stat. §66-95; (b) "file with the North Carolina Secretary of State two copies of the disclosure statement" and a fee of $10.00, . . . *"prior* to placing any advertisement or making any other representations to prospective purchasers in this State" N.C. Gen. Stat. §66-97(a) (1994)(emphasis added); and (c) file with the Secretary of State "an irrevocable consent appointing the Secretary of State or his successors in office to be his attorney in fact to receive service of any lawful process in any noncriminal suit, action or proceeding against the seller . . ." N.C. Gen. Stat. §66-97(b). Failure to do so constitutes a Class 1 misdemeanor. N.C. Gen. Stat.§66-97(e)(1994). The seller "shall not: (1) Represent that the business opportunity provides income or earning potential of any kind unless the seller has documented data to substantiate the claims of income or earning potential and discloses this data to the prospective purchaser at the time such representations are made." N.C. Gen. Stat. §66-98(1)(1977). Finally, "The seller's principal business address and the name and address of its agent in the State of North Carolina authorized to receive service of process in addition to the Secretary of State as provided in G.S. 66-97(b)." N.C. Gen. Stat. §66-99 (1983).

Defendant has not complied with any of the BOSA requirements set out in the preceding paragraph. (*See* Affidavit of North Carolina Secretary of State, dated June 6, 2002, attached hereto and incorporated

herein as Exhibit "2").

Pursuant to N.C. Gen. Stat. §66-100, if a business opportunity seller does not comply with the terms of N.C. Gen. Stat. §66-95, has a contract which does not comply with the terms of N.C. Gen. Stat. §66-99, or fails to fulfill its obligations necessary to begin substantial operation of the business, the purchaser is entitled to void the contract and to receive the return of all sums paid to the seller. N.C. Gen. Stat. §66-100. Section 66-100 continues by providing for the recovery of reasonable attorney's fees and makes a violation of BOSA a *per se* an unfair practice pursuant to N.C. Gen. Stat. §75-1.1. Id.

Plaintiff, in reliance upon Defendant's representations that it routinely re-purchased territories when the purchaser was dis-satisfied, initially requested that ColorAll re-purchase the business inasmuch as Plaintiff was not receiving the promised support. ColorAll refused to re-purchase the business despite its pre-purchase representations.

On or about September 30, 2001 and on various dates thereafter, Plaintiff made demand upon Defendant requesting that the contract terminated and voided and that the sums paid by Plaintiff be returned. Defendant failed to comply with these demands, threatening that monthly royalty payments would be due through the duration of the contract. Defendant's refusal to release Mr. Mohan and to comply with Mr. Mohan's demands lead to the action currently pending before this Court.

## II.

### Is Defendant entitled to have this matter dismissed or transferred?

Defendant's Motion for Dismissal or for Transfer are predicated upon the concept that the issues before this Court derive from a binding contract entered into by Plaintiff with Defendant. Furthermore, though all actions related to the contract, save its execution by Defendant occurred in the State of North Carolina, Defendant asserts that this matter may only be heard in the State of Florida pursuant to Florida law because of the forum, venue and choice of law provisions of the purported contract.

6

In an unpublished decision for a matter which closely mirrors the matter currently before this Court, the Fourth Circuit affirmed the decision of the district court, which was the United States District Court for the Eastern District of North Carolina, in which the district court held:

> The district court denied IBS's motion to dismiss, holding that IBS cannot rely on the rule that the law of the place of execution of a contract applies because the complaint does not allege a breach of the licensing contract or raise a dispute about the meaning of its terms. Rather, the complaint alleges violations of BOSA and UDTPA, occurring in North Carolina.

Oset v. Interstate Brokerage of the Southeast, Incorporated, Nos. 00-1029, 00-1109 (4th Cir. Dec. 19, 2000), *also cited as* 238 F.3d 413, 2000 WL 1853332 (a true and exact copy of which is attached hereto and incorporated herein as required by the Local Rules of Practice and Procedure of the United States District Court for the Eastern District of North Carolina, Rule 5.04).

In the instant case, the complaint alleges: Failure to Comply with the North Carolina Business Sales Opportunity Act (*sic*); Breach of Contract, which is based upon Defendant's failure to comply with the North Carolina Business Opportunity Sales Act; and Unfair and Deceptive Acts or Practices pursuant to N.C. Gen. Stat. §75-1.1. None of these claims arise out of the terms or content of the purported contract, but instead arise out of the provisions of BOSA and Chapter 75. All the claims advanced by Plaintiff involve acts that occurred in North Carolina and the majority occurred prior to the execution of the contract. The only claim involving a post-contract action involves a claim pursuant to BOSA of Defendant's failure to provide the support promised in pre-contract disclosures.

Pursuant to N.C. Gen. Stat. §66-100, Plaintiff, where the "business opportunity seller uses any untrue or misleading statements in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by G.S. 66-95, . . ., or if the contract does not comply with the requirements of G.S. 66-99, then, within one year of the date of the contract, upon written notice to seller, the purchaser may void the contract." N.C. Gen. Stat. §66-100.

7

# ARGUMENT

In the case before this Court, the defendant's Internet web page explaining "The ColorAll™ Area Franchise Program" (attached hereto and incorporated herein as Exhibit "3") provides in pertinent parts, "Our expansion provides committed Franchisees the opportunity to build a profitable business which would result in the rapid buildup of a valuable business asset rather than just a 'job'" and "Each ColorAll™ market covers an exclusive area selected for is highest profit and growth potential." "The ColorAll™ Home Page" (attached hereto and incorporated herein as Exhibit "4") bills the market as a "unique recession-proof niche". "The ColorAll Design of a Perfect Business" page (attached hereto and incorporated herein as Exhibit "5") notes that the founders "defined the areas of greatest importance as: . . . A very high degree of profitability . . . Virtually unlimited amounts of business available . . . Ability to build equity rapidly (values approximate one time annual gross)."

In a marketing newsletter (attached hereto and incorporated herein as Exhibit "6") provided to Plaintiff during preliminary discussions about Plaintiff's possible purchase of a franchise, Defendant provides numerous accounts of local franchisees and technicians, who work for the franchisees, who have experienced significant growth and earnings from their investment. The report includes statements that technicians "are exceeding the expectations set by the local Area Franchisees." A separate article in the same newsletter reports that a certain Area Franchisee "is enjoying enormous success along with his technicians." The article notes that the Franchisee's "technicians earn more than many attorneys in the area."

The Area Franchisee Agreement provides in "Section XXIV. Technical Franchisees" those requirements a Franchisee must provide to its "Technical Franchisees". The Franchisee is responsible for: (ii) supervis[ing], coordinat[ing] and administer[ing] the Technical-Franchisee operations; (iv) provid[ing] billing and collection services including providing the Franchisor with monthly updates on records reflecting the billing and collection; (v) paying each Technical Franchisee on a weekly basis 60% of the

8

billable work that the technician completed the previous week; (vii) "use its best efforts to procure regular authorized customers for Technical Franchisees and annually increase the amount of business by at least 10% of that for the preceding year for the first 3 years of the term of this Agreement." *See* Franchise Agreement, §XXIV, ¶A. (attached hereto and incorporated herein as Exhibit "7")

A reasonable person reading the newsletter articles would read the articles to reflect on the profitability of the system and could, based upon a rudimentary understanding of the ColorAll structure, compute a profit expectation.

For the foregoing reasons, Plaintiff prays this Court to grant its Motion for Summary Judgment and to deny Defendant's Motions.

This the 12ᵗʰ day of July, 2002.

VANN & SHERIDAN LLP

Paul A. Sheridan, N.C. State Bar No.19272
Attorneys for Plaintiff
Post Office Box 2445
Raleigh, N.C. 27602-2445
Telephone: (919) 510-8585
Facsimile: (919) 510-8570

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing **Memorandum of Law in Support of**

**Plaintiff's Motion For Summary Judgment and in Opposition to Defendant's Motion to Dismiss** by

placing a copy in an envelope, and depositing it in a receptacle of the United States Post Office, postage

prepaid, addressed to:

David E. Fox
Betsy Cooke
MOORE & VAN ALLEN PLLC
One Hannover Square, Suite 1700
Raleigh, N.C. 27601

This the 12th day of July, 2002.

**VANN & SHERIDAN LLP**

Paul A. Sheridan - N.C. State Bar No. 19272
Attorneys for Plaintiff
Post Office Box 2445
Raleigh, N.C. 27602-2445
Telephone: (919) 510-8585
Facsimile: (919) 510-8570



# North Carolina
## Department of the Secretary of State

    **I, ELAINE F. MARSHALL,** Secretary of State of the State of North Carolina, do hereby certify that on the date set forth hereunder, a search was made of the records of the Corporations Division in order to locate any documents filed pursuant to the laws administered by the Department of the Secretary of State in the name of

### COLORALL TECHNOLOGIES INTERNATIONAL, INC.

    I FURTHER CERTIFY that the aforesaid search failed to disclose that any such documents have been filed with the Corporations Division in the name set forth above.



IN WITNESS WHEREOF, I have hereunto
set my hand and affixed my official seal at the
City of Raleigh, this 6th day of June, 2002.

*Elaine F. Marshall*

**Secretary of State**

Certification Number: 6160120-1  Page:  1 of -1       Ref.# 4856895-
Verify this certificate online at www.secretary.state.nc.us/Verification.



**Inbox - Microsoft Outlook**

File Edit View Favorites Tools Actions Help

Outlook Shortcuts

## The ColorAll™ Area Franchise Program

**ColorAll™ Technologies International, Inc.**

The management of the company made the decision to expand nationally by making turnkey operations available to qualified individuals in the form of Area franchises.

**The ColorAll™ Home Page**

**The ColorAll™ Design of a Perfect Business**

**The ColorAll™ Area Franchise Program**

*"One can never consent to creep when one feels an impulse to soar."*
HELEN KELLER

To continue the very substantial growth ColorAll™ has experienced over the past ten years, the management of the company made the decision to expand nationally by making turnkey operations available to qualified individuals in the form of Area Franchises. Our expansion provides committed Franchisees the opportunity to build a profitable business which would result in the rapid buildup of a valuable business asset rather than just a good income.

ColorAll™'s objective is to find individuals to whom it can, within a close working relationship, pass on the experience (both positive and

Often we have choices to make that can change our lives.

Start | Inbox - Microsoft Outlook | About...



**ColorAll™ Nationwide Services**

**ColorAll™ Corporate**

**ColorAll™ Scope of Work (Pictorial)**

**Communicate with ColorAll™**

...together, systems, methods and techniques that we have allowed us to structure a financially successful business over the last ten year period. To this end, ColorAll™ has designed a program that offers local territories protected by stringent franchise agreements.

## The FRANCHISEE!

Each ColorAll™ market covers an exclusive area selected by our ... market conditions ... growth potential. The ColorAll™ concept is being rolled out nationwide through a network of these local Franchises. The Franchisee, who is familiar with his market, brings with ... ... ... ... ... ... ... ... ... ... ... opportunity.

The ... ... ... ... ... ... ... ... each ... to run the franchised company will be provided with all the ColorAll™ mobile technique package and training for themselves and three technicians. In addition, they will have the benefit of ColorAll's corporate staff to open new accounts in their territories and provide continuous support.

The training provided under the Franchises Program will not only cover the everyday...



accounts in their territories and provide continuous support.

The training provided under the Franchisee Program will not only cover the everyday operational aspects of the business, but will also train the Franchisee in the critical management portion of the business. This will give the Franchisee the option of teaching these skills to an Account Manager. The Franchisee need not acquire any color painting skills, since experienced auto painters are readily available in the marketplace to perform this type of work once they are trained by ColorAll's highly professional trainers.

ColorAll is not currently offering franchise opportunities to residents of the following states: Illinois, Nebraska, North Dakota, Rhode Island, South Dakota and Wisconsin. Accordingly, if you are a resident of one of those states, until ColorAll registers the offer and sale of its franchises with your state, ColorAll can neither offer you a franchise nor have any further discussions with you about franchise opportunities for such states.



**ColorAll™ Technologies International, Inc.**



The ColorAll™
Home Page

The ColorAll™ Design
of a Perfect Business

The ColorAll™ Area
Franchise Program

ColorAll™ Nationwide
Services

ColorAll™ Corporate

ColorAll™ Scope of
Work (Pictorial)

Communicate with
ColorAll™

# The ColorAll™ Home Page

"Pioneers in Automotive Color Reconditioning"

**"There are only two reasons a used car won't sell...It's either _over_ priced or _under_ reconditioned."**

Or simply stated, nice looking cars demand a much higher price than ugly ones. ColorAll™ targets this unique recession-proof niche by providing new and used car dealers, rental car companies, corporate and municipal fleets, auction sites and other markets with a single source vendor who can solve all their color reconditioning problems at their location. With ColorAll™ on their team, the car dealership manager can concentrate on getting the best prices for the cars on his lot and increase his per car profit, or in the case of the car rental or fleet accounts, get the vehicle back on the road quickly, earning income.

This unfilled need, in the $150 billion used car industry and the $100 billion car rental industry, was identified by two successful businessmen, who themselves, couldn't paint a fence let alone a car. Still, they designed the perfect program for this market and became the pioneers of the industry. Since its inception, the ColorAll™ Technologies System has been welcomed by the marketplace and is recognized as an integral part of their reconditioning programs.

ColorAll is not currently offering franchise opportunities to residents of the following states: Illinois, Nebraska, North Dakota, Rhode Island, South Dakota and Wisconsin. Accordingly, if you are a resident of one of those states, until ColorAll registers the offer and sale of its franchises with your state, ColorAll can neither offer you a franchise nor have any further discussions with you about franchise opportunities for such states.

**TO CONTACT US:**

Phone: 954-969-1599
Fax:    954-969-1679
Email:  colorall@gate.net

Corporate Headquarters:

1540 North Powerline Road
Pompano Beach, Florida  33069

# The Design Of A Perfect Business

When the principals of ColorAll™ Technologies International, Inc. were introduced to each other more than ten (10) years ago they had between them almost 50 years of entrepreneurial business experience in a number of successful business ventures (many of which became leaders in their respective industries).

When Gil & Jerry decided to enter business together they decided to utilize their accumulated knowledge and experience to design for themselves a business which would provide the best of all possible worlds.

They defined the areas of greatest importance as:

- No or extremely low overhead
- No advertising requirements for new business
- Not a retail business (no waiting for customers)
- A four day work week
- Ability to take regular vacations
- No employees (No FICA/SS/Unemployment, etc.)
- No inventory
- Variable costs tied to completion of work
- A very high degree of profitability
- A large pool of independent contractors to draw from
- Virtually unlimited amounts of business available
- Constant expansion possibilities
- Ability to run business as passive investment (if desired)
- Not a cash business (no opportunity for theft)
- Ability to build equity rapidly (values approximate one time annual gross)
- Low cost of goods
- Ability to use cellular phone for primary business communication tool
- No necessity to sell anyone on a new concept
- No "one-time sales" (ability to develop long term relationships)
- A business that requires no hard sales

The resulting product of this specific intent to design the perfect business gave birth to ColorAll.



**ColorAll™ Technologies International, Inc.**



The ColorAll™
Home Page

The ColorAll™ Design
of a Perfect Business

The ColorAll™ Area
Franchise Program

ColorAll™ Nationwide
Services

ColorAll™ Corporate

ColorAll™ Scope of
Work (Pictorial)

Communicate with
ColorAll™

# The ColorAll™ Design of a Perfect Business

### The Design Of A Perfect Business

When the principals of ColorAll™ Technologies International, Inc. were introduced to each other more than ten (10) years ago they had between them almost 50 years of entrepreneurial business experience in a number of successful business ventures (many of which became leaders in their respective industries).

When Gil & Jerry decided to enter business together they decided to utilize their accumulated knowledge and experience to design for themselves a business which would provide the best of all possible worlds.

They defined the areas of greatest importance as:

- No, or extremely low overhead
- No advertising requirements for new business
- Not a retail business (no waiting for customers)
- 9 - 5 work day  (5 days)
- Ability to take regular vacations
- No employees (No FICA/SS/Unemployment, etc.)
- No inventory
- Variable costs tied to completion of work
- A very high degree of profitability
- A large pool of independent contractors to draw from
- Virtually unlimited amounts of business available
- Constant expansion possibilities
- Ability to run business as passive investment (if desired)
- Not a cash business (no opportunity for theft)
- Ability to build equity rapidly (values approximate one time annual gross)
- Low cost of goods
- Ability to use cellular phone for primary business communication
- No necessity to sell anyone on a new concept
- No "one-time sales" (ability to develop long term relationships)

- A business that requires no hard sales

The resulting product of this specific intent to design the perfect business gave birth to ColorAll.

**TO CONTACT US:**

Phone: 954-969-1599
Fax:    954-969-1679
Email:  colorall@gate.net

Corporate Headquarters:

1540 North Powerline Road
Pompano Beach, Florida  33069



**ColorAll™ Technologies
International, Inc.**



# The ColorAll™ Area
# Franchise Program

"the management of the company made the decision to expand nationally by making turnkey operations available to qualified individuals in the form of Area Franchises."

**The ColorAll™
Home Page**

**The ColorAll™ Design
of a Perfect Business**

**The ColorAll™ Area
Franchise Program**

**ColorAll™ Nationwide
Services**

**ColorAll™ Corporate**

**ColorAll™ Scope of
Work (Pictorial)**

**Communicate with
ColorAll™**



Often we have
choices to make that
can change our lives.

**TO CONTACT US:**

Phone: 954-969-1599
Fax:    954-969-1679
Email:  colorall@gate.net



**ColorAll™ Technologies
International, Inc.**



# ColorAll™ Nationwide Services

**Car Dealerships
Used and New Cars
Auction Sites**

**Rental Car Companies
Corporate or Municpal
Fleets**

**The ColorAll™
Home Page**

**The ColorAll™ Design
of a Perfect Business**

**The ColorAll™ Area
Franchise Program**

**ColorAll™ Nationwide
Services**

**ColorAll™ Corporate**

**ColorAll™ Scope of
Work (Pictorial)**

**Communicate with
ColorAll™**

## Services Available Across the Nation

What ColorAll™ offers the customer!

- A single source vendor for both interior <u>and</u> exterior reconditioning services.
- High quality work equal to that of their existing in-house body shop.
- Reliable service with <u>regular weekly</u> visits.
- Same day or next day completion of work.
- Rapid emergency response due to rapid cellular communications.
- Prices significantly lower than those charged by body shops.
- Professionally trained staff working directly with dealership and car rental managers.

## ColorAll™ Services

### Exterior Services



- Scrapes, tears, cuts and damage on bumpers.
- Small and medium size damage, key scratches and faded paint spots on the body.
- Scratches, scrapes and fading on the black trim parts on the car.
- Faded convertible or padded roofs.
- Buffing or wet sanding out hair line scratches.

### Interior Services



- Worn and faded carpets.
- Faded or stained cloth seats.
- Worn and damaged leather seats.
- Faded and damaged steering wheels.
- Faded dashboards and door panels.

ColorAll does not repair "major damage" on cars. That is properly the domain of the body shop. Our objective is to repair and recondition small and medium damage on vehicles which would make the buyer feel that the car he's

thinking of buying has been abused. Always, the rule the ColorAll Service Technician follows is to confine his work to the smallest area possible -- to do as little as needs to be done to solve the problem.

ColorAll Area Franchises are located across the nation, from Maine to California, from Florida to the state of Washington. Call today to find the location nearest you; 954-969-1599

ColorAll is not currently offering franchise opportunities to residents of the following states: Illinois, Nebraska, North Dakota, Rhode Island, South Dakota and Wisconsin. Accordingly, if you are a resident of one of those states, until ColorAll registers the offer and sale of its franchises with your state, ColorAll can neither offer you a franchise nor have any further discussions with you about franchise opportunities for such states.

**TO CONTACT US:**

Phone: 954-969-1599
Fax:    954-969-1679
Email:  colorall@gate.net



**ColorAll™ Technologies
International, Inc.**

# ColorAll™ Corporate

*When ColorAll™ began, it met an unfilled need...the same is even more true today! ColorAll™ is unique not only in the umbrella of services we provide, but even more importantly, in the Business Methodology we utilize.*"

**The ColorAll™
Home Page**

**The ColorAll™ Design
of a Perfect Business**

**The ColorAll™ Area
Franchise Program**

**ColorAll™ Nationwide
Services**

**ColorAll™ Corporate**

**ColorAll™ Scope of
Work (Pictorial)**

**Communicate with
ColorAll™**



ColorAll™ -- Becoming
#1 in the Franchise
and Reconditioning
Industries.

**TO CONTACT US:**

**Phone: 954-969-1599**
**Fax:     954-969-1679**
**Email:  colorall@gate.net**



**ColorAll™ Technologies International, Inc.**



# ColorAll™ Scope of Work (Pictorial)

ColorAll provides the services of a "mobile body shop". The "Scope of Work" provided by ColorAll stands above its competition.



**The ColorAll™ Home Page**

**The ColorAll™ Design of a Perfect Business**

**The ColorAll™ Area Franchise Program**

**ColorAll™ Nationwide Services**

**ColorAll™ Corporate**

**ColorAll™ Scope of Work (Pictorial)**

**Communicate with ColorAll™**
















ColorAll is not currently offering franchise opportunities to residents of the following states: Illinois, Nebraska, North Dakota, Rhode Island, South Dakota and Wisconsin. Accordingly, if you are a resident of one of those states, until ColorAll registers the offer and sale of its franchises with your state, ColorAll can neither offer you a franchise nor have any further discussions with you about franchise opportunities for such states.

**TO CONTACT US:**

Phone: 954-969-1599
Fax:   954-969-1679
Email:  colorall@gate.net



**ColorAll™ Technologies International, Inc.**

# Communicate with ColorAll™

## The ColorAll™ Home Page

## The ColorAll™ Design of a Perfect Business

## The ColorAll™ Area Franchise Program

## ColorAll™ Nationwide Services

## ColorAll™ Corporate

## ColorAll™ Scope of Work (Pictorial)

## Communicate with ColorAll™

### ColorAll™ Communications

Answer either A, B or C for each question listed below. Use the comments section for any additional information required or offered.

Your interest is: (If applicable)

○ Owning a Franchise

○ Using ColorAll as a Vendor

○ Becoming a ColorAll Service Technician

How did you hear about ColorAll?

○ Surfing the WEB

○ Colleague or Friend

○ Satisfied Customer

If you are a potential customer, your business is;

○ Automobile dealership

○ Rental Car Company

○ Other Form of Fleet

I am; (If applicable)

○ An Area Franchisee

○ A ColorAll Technician

○ ColorAll Corporate Staff

Comments:

Last Name: _____  First Name: _____

Company Name: (If Applicable) _____

Address: _____

City: _____  State/Prov: _____

Country: _____  Zip Code: _____

Phone: _____

E-mail: _____



**TO CONTACT US:**

Phone: 954-969-1599
Fax:    954-969-1679
Email:  colorall@gate.net

919-363-8667

*Michael— I apologize! -Becky—*



**Volume 1, Issue 1**
**September 2000**

## The ColorAll Connection
### Special Technician Edition

# *ColorAll Technicians*
# *Today's Opportunity*

Stories are coming in every day to our corporate offices about ColorAll technicians that are exceeding the expectations set by the local Area Franchisees. There is no shortage of work!

In Raleigh, North Carolina Martin Shuman and Richard Zahensky have worked very hard and their hard work is now paying off. They purchased their ColorAll Area Franchise 6 months ago. They have 5 technicians and one helper and they CAN'T GET ALL THE WORK DONE. They hired Wayne Goss a few weeks ago. In Wayne's first full week his billing was $3,725. In his third week at work his billing was $5,380. His check that week was for $1,750. Martin and Richard are very proud of Wayne, as well they should be.

Tony Delgadillo works for

Dick Wright in Las Vegas. Tony has been with Dick right around six months. Tony's average weekly billing is $5,000. Dick said when I spoke to him that this week Tony expects to bill $8,000!

Cliff Peterson also works for Dick Wright. Cliff is Dick's oldest technician. He has worked in that territory for approximately one year and eight months and is Dick's trainer for newly hired technicians. Dick also said Cliff has become a "blending expert". Cliff's average weekly billing is near $3,000 and his peak week was $4,500. Dick recommends utilizing helpers for technicians and paying helpers $400 per week. Dick also places great emphasis on good account management, especially consistent quality control.

In Atlanta, Tommy Myers is the Area Franchisee. Tommy's technicians Clever Gayle and Chuck Thompson range consistently from $2,500 to $3,500 in weekly billings.

Sean Selby and Bryant Karnes are George Rutan's technician's in Columbus, Ohio. Both Sean and Bryant average $3,500 in weekly billing. Sean's peak week was $5,800 and Bryant's peak week was $4,800. George said that Sean and Bryant are great to work with. They have a great attitude and a great work ethic. George said, "They take it on and get it done". George is very proud of Sean and Bryant and has enormous appreciation for what they do and how they do it.

**GREAT JOB GUYS!**

32.5%

## Las Vegas, Nevada
## ColorAll Technician Bills $7,200 in 1 Week!

In Las Vegas, Dick Wright is the Area Franchisee. Dick is enjoying enormous success along with his technicians. When he works on used cars at a dealership he follows up with the other departments; new cars, service department, body shop. Many of

his technicians work every day at the same dealership. Dick charges a lot more than most of his competition, but they keep coming back to him. Dick's technicians earn more than many attorneys in the area. **Robert Garcia works for Dick, moved to Las Vegas**

from Hawaii and has a body shop background. **Robert's weekly billing averages $5,500 and his highest week was $7,200!** Dick says he gets along with everybody.

*Way to go Robert!*

Acknowledgement & Appreciation for ColorAll Technicians

| | |
|---|---|
| Las Vegas, Nevada Robert Garcia, Tony Delgadillo and Cliff Peterson | 1 |
| Raleigh, North Carolina Wayne Goss | 1 |
| Columbus, Ohio Sean Selby and Bryant Karnes | 1 |
| Atlanta, Georgia Clever Gayle and Chuck Thompson | 1 |



*Area Franchise Lead Technician parachutes in to save the day for ColorAll customers.*

ColorAll®

**AREA FRANCHISE AGREEMENT**

# TABLE OF CONTENTS

Page No.

I.    APPOINTMENT AND FRANCHISE FEE ..................................................................... 1

II.    TERM AND RENEWAL ........................................................................................... 2

III.   TRAINING AND ASSISTANCE ............................................................................... 3

IV.   PROPRIETARY MARKS ........................................................................................ 4

V.    CONFIDENTIAL OPERATING MANUAL AND BULLETINS ..................................... 5

VI.   CONFIDENTIAL INFORMATION ............................................................................ 5

VII.  MODIFICATION OF THE SYSTEM ........................................................................ 6

VIII. ROYALTY FEE ..................................................................................................... 6

IX.   ACCOUNTING AND RECORDS ............................................................................. 7

X.    STANDARDS OF QUALITY AND PERFORMANCE ................................................ 8

XI.   INSURANCE ........................................................................................................ 10

XII.  COVENANTS ....................................................................................................... 10

XIII. DEFAULT AND TERMINATION ............................................................................. 11

XIV. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION ....... 12

XV.  TRANSFERABILITY OF INTEREST ..................................................................... 14

XVI. DEATH OR INCAPACITY OF FRANCHISEE ........................................................ 15

XVII. RIGHT OF FIRST REFUSAL ............................................................................... 15

XVIII. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ................................... 16

XIX. CAVEAT ............................................................................................................. 16

XX.  APPLICABLE LAW; MEDIATION AND ARBITRATION .......................................... 17

XXI. ACKNOWLEDGMENTS ........................................................................................ 18

XXII. NATIONAL AND REGIONAL ACCOUNTS ............................................................ 19

XXIII. MONTHLY CAR ALLOWANCE ............................................................................ 19

XXIV. TECHNICAL FRANCHISEES .............................................................................. 19

XXV. MISCELLANEOUS .............................................................................................. 20

Exhibits:

1.    CURRENT OWNERS OF FRANCHISEE

2.    ASSUMPTION AGREEMENT

**ColorAll**

## AREA FRANCHISE AGREEMENT

This AREA FRANCHISE AGREEMENT ("Agreement"), is entered as of _12/15_ , 2000, by ColorAll TECHNOLOGIES INTERNATIONAL, INC., a Florida corporation, having its principal place of business at 1540 North Powerline Road, Pompano, FL 33069 ("FRANCHISOR"), and MICHAEL MOHAN, having its principal place of business at 1204 Chapel Ridge Road, Apex, North Carolina 27502 ("FRANCHISEE").

## INTRODUCTION:

A.      FRANCHISOR has a unique system ("System"), identified by the mark "ColorAll" and other marks (collectively, the "Marks").  FRANCHISOR's System provides business owners with procedures and support for establishing, developing, and operating a distinctive business providing repair services for minor cosmetic defects on or inside of automobile bodies.

B.      FRANCHISOR's System is distinguished by the Marks, operating manuals, marketing methods, special graphics package and trade dress, and support and training provided to FRANCHISEE in the operation of its business.

C.      FRANCHISOR awards franchises to qualified persons to own and operate ColorAll businesses. FRANCHISEE has applied to operate a ColorAll business using the System within a designated territory under this Agreement—as well as to provide advisory, coordinating, and administrative services to technical franchisees whom FRANCHISOR authorize to operate within the designated territory.

D.      FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality and service and the necessity of operating its ColorAll business in conformity with FRANCHISOR's standards and specifications.

E.      In reliance on FRANCHISEE's franchise application and its commitments in this Agreement, FRANCHISOR has elected to award a ColorAll franchise to FRANCHISEE.

NOW, THEREFORE, the parties agree as follows:

## I.      APPOINTMENT AND FRANCHISE FEE

A.      FRANCHISOR grants FRANCHISEE a non-exclusive license to use the mark "ColorAll" and any other authorized Marks and to operate a ColorAll business (the "Franchised Business") in accordance with the System exclusively within the following territory (the "Protected Territory").

The Counties of Rockingham, Caswell, Person, Guilford, Alamance, Orange, Durham, Randolph and Chatham in the State of North Carolina.

B.      FRANCHISEE must use the System and Marks only in connection with the Franchised Business.  The Franchised Business must service only customers located within the Protected Territory.  It must not service any other type of customer.  FRANCHISOR may change, improve, and further develop the System.

C.        In consideration of the franchise granted in this Agreement for one ColorAll franchise, on signing this Agreement, FRANCHISEE must pay FRANCHISOR an initial franchise fee of $65,000. FRANCHISEE must pay this initial franchise fee as follows:

(i)        $____30,000.00____ on signing this Agreement;
(ii)        $____20,000.00____ before initial training and 3 technical set-ups (Freight On Board - South Florida); and
(iii)        $____15,000.00____ before account-opening and training in the Protected Territory.

This fee is considered fully earned and non-refundable on payment to FRANCHISOR. Any deposit FRANCHISEE paid to FRANCHISOR under any written deposit agreement will be credited in accordance with that deposit agreement against the initial franchise fee.

D.        During the term of this Agreement, so long as FRANCHISEE strictly complies with this Agreement, FRANCHISOR will not operate, nor license others to operate, within the Protected Territory, a mobile ColorAll business that uses the System.  Nor, under such circumstances, may FRANCHISOR authorize another area franchisee to operate within the Protected Territory.  But FRANCHISOR may, with the FRANCHISEE's consent, license technical franchisees to use the System within the Protected Territory ("Technical Franchisees").  Technical Franchisees service accounts within the Protected Territory that FRANCHISEE procures.  FRANCHISEE must procure such accounts and supervise such Technical Franchisees in accordance with the terms of this Agreement.  Furthermore, within or without the Protected Territory, FRANCHISOR and its licensees may through dissimilar channels of distribution, sell goods and services similar to those it authorizes FRANCHISEE to sell.  Dissimilar channels of distribution are all channels of distribution that do not provide goods or services to customers on a mobile basis.

E.        FRANCHISEE must begin operating the Franchised Business within 90 days of the date of this Agreement.

## II.        TERM AND RENEWAL

A.  This Agreement is effective for an initial term of 10 years from the date of this Agreement.

B.  FRANCHISEE may renew the franchise granted in this Agreement at the expiration of the initial term of the Agreement for an additional term of 10 years, provided all of the following conditions are fulfilled before the start of each additional term:

1.  During the entire term of this Agreement, FRANCHISEE has complied with all the provisions of this Agreement and any other agreement with FRANCHISOR or any of its affiliates;

2.  FRANCHISEE makes such capital expenditures as FRANCHISOR requires to renovate, modernize, and enhance the Franchised Business (including, without limitation, expenditures on vehicles, signs, and equipment) to conform with FRANCHISOR's then current standards and completes such renovation, etc., within the time specified by FRANCHISOR;

3.  FRANCHISEE executes a general release of all claims against FRANCHISOR and its affiliates, and their respective officers, directors, shareholders, agents and employees;

4.  FRANCHISEE gives notice of renewal to FRANCHISOR as provided below;

5.  On renewal, FRANCHISEE signs FRANCHISOR's then-current form of Franchise Agreement (with appropriate modifications to reflect the fact that the agreement relates to the grant of a renewal franchise), which agreement supersedes in all respects this Agreement, and the terms of which may differ from the terms of this Agreement; and

6. FRANCHISEE pays FRANCHISOR a renewal fee in the amount of $1000 or such greater amount as required for renewals in the form of agreement then used for new franchisees, together with any other amounts due FRANCHISOR under this Agreement or any other agreement with FRANCHISOR.

C. FRANCHISEE must give FRANCHISOR written notice of whether it desires to renew or not to renew this Agreement at least three months, but not more than six months, prior to the expiration of the term of this Agreement. FRANCHISEE may only renew this Agreement if FRANCHISEE has complied with all the requirements contained in this Section II. and continues to comply with all the terms of this Agreement up to the date of expiration of the term. If FRANCHISEE fails to satisfy all the conditions in this Section, FRANCHISEE is considered to have waived its renewal right.

## III.      TRAINING AND ASSISTANCE

A. Before FRANCHISEE starts operating the Franchised Business, FRANCHISOR will (i) send FRANCHISEE an action list to outline the steps the FRANCHISEE must take to position himself for business, including the advertising format and a script to use to recruit service technicians; and (ii) FRANCHISEE shall fax responses to ads to corporate for scheduling of interviews, followed by an on site visit by a FRANCHISOR staff member to the Protected Territory to assist with personal interviews with technical candidates (which visit is at FRANCHISOR's expense); and (iii) make initial training available to FRANCHISEE, or its manager, and up to three technicians. FRANCHISOR schedules the training. FRANCHISEE or its manager must attend this initial training, which will be conducted at FRANCHISOR'S headquarters in Florida or in such other location that FRANCHISOR designates. The initial training program lasts five days. It includes both classroom and hands-on instruction and covers material aspects of operating a ColorAll Franchised Business. FRANCHISEE is solely responsible for all expenses incurred by FRANCHISEE, its manager, and technicians to attend such program, including, without limitation, travel, food, and lodging expenses and salaries, if any. If FRANCHISEE desires additional training and FRANCHISOR considers such training appropriate, FRANCHISOR will provide such training at a mutually acceptable location within the Protected Territory at a weekly charge of $1,000, plus expenses. There is no charge if such additional training is conducted at FRANCHISOR's corporate training center.

B. After FRANCHISEE attends initial training and at a time mutually acceptable to the parties, FRANCHISOR will provide FRANCHISEE with four (4) days of account-opening training at a mutually acceptable site within the Protected Territory. FRANCHISOR will send two staff members to conduct account-opening training. These staff members will instruct FRANCHISEE how to open accounts and will open initial accounts for FRANCHISEE. Approximately one (1) month after this on site training, the FRANCHISOR will revisit the FRANCHISEE for a period of 2 days to evaluate the progress of the FRANCHISEE and provide any additional assistance, if he sees fit, to the FRANCHISEE. If FRANCHISEE desires additional account—opening training and FRANCHISOR considers such training appropriate, FRANCHISOR will provide three days of additional account—opening training at a mutually acceptable location within the Protected Territory at a charge of $1000, plus expenses.

C. During the term of this Agreement, FRANCHISOR may from time to time develop new products and methods for operating FRANCHISEE's business.

D. On an average of once a week for the first 30 days after FRANCHISEE starts operating the Franchised Business, FRANCHISOR will telephone FRANCHISEE to discuss its operational progress. Thereafter, assistance with any operational problems will be available anytime during business hours, at FRANCHISEE's initiative, on a continuing basis via telephone or fax. Continuous technical support will be available through FRANCHISOR's tech support number.

E. FRANCHISOR may from time to time hold conferences to discuss sales techniques, personnel training, bookkeeping, accounting, inventory control, performance standards, and marketing procedures. There will be no conference fee. FRANCHISEE, however, is responsible for travel, food,

and lodging expenses. These conferences may be held at the FRANCHISOR's South Florida headquarters or at some other convenient location chosen by the FRANCHISOR.

## IV.    PROPRIETARY MARKS

A.  FRANCHISEE's right to use the Marks is derived solely from this Agreement and is limited to FRANCHISEE's conducting the Franchised Business in compliance with this Agreement and all applicable standards, specifications, and operating procedures FRANCHISOR prescribes during the term of the franchise. Any unauthorized use of the Marks by FRANCHISEE is a breach of this Agreement and an infringement of FRANCHISOR's rights in the Marks. All FRANCHISEE's use of the Marks and any goodwill established by such use inures to FRANCHISOR's exclusive benefit. This Agreement does not confer any goodwill or other interests in the Marks on FRANCHISEE. FRANCHISEE must not use or attempt to register any other trademarks, service marks, or other commercial symbol that is the same as or similar to any of the Marks, nor any mark with phonetic or graphic similarity to those of FRANCHISOR, for use in connection with the development, operating, or franchising of any business similar to that then permitted under the System. During and after the term of this Agreement, FRANCHISEE must not, directly or indirectly, either alone or in conjunction with others, challenge or take any action to cause a challenge to the validity or ownership of the Marks, or to obstruct FRANCHISOR's efforts with respect to the registration of the Marks. All provisions of this Agreement applicable to the Marks apply to any and all additional trademarks, service marks, and commercial symbols that FRANCHISOR authorizes for use by and licenses to FRANCHISEE after the date of this Agreement.

B.  FRANCHISEE must not use any Mark or portion of any Mark as part of a corporate or trade name, or with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form. FRANCHISEE must not use any Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by FRANCHISOR. All Marks must be displayed only in the manner FRANCHISOR prescribes.

C.  If FRANCHISEE becomes aware of any use of the Marks or any colorable imitation of the Marks by any person other than FRANCHISOR or its franchisees, within seven days therefrom, FRANCHISEE must notify FRANCHISOR of such use or imitation. FRANCHISEE must also notify FRANCHISOR of any action, claim or demand against FRANCHISEE relating to the Marks within seven days after FRANCHISEE receives notice of such action, claim or demand. FRANCHISOR has the sole right to defend, settle, or otherwise respond to any such action. FRANCHISOR has the exclusive right to contest or bring action against any third party regarding the third party's use of any of the Marks and may exercise such right in its sole discretion. In any defense or prosecution of any litigation relating to the Marks or components of the System undertaken by FRANCHISOR, FRANCHISEE must cooperate with FRANCHISOR and execute all documents and take all actions FRANCHISOR's counsel considers necessary or desirable to carry out such defense or prosecution. FRANCHISOR will reimburse FRANCHISEE for all out-of-pocket expenses FRANCHISEE reasonably incurs in connection with such actions requested by FRANCHISOR's counsel. FRANCHISOR makes no representation or warranty, express or implied, as to the use, exclusive ownership, validity, or enforceability of the Marks.

D.  If FRANCHISOR, in its sole discretion, decides to modify or discontinue use of any Mark, and/or use of one or more additional or substitute trade names, trademarks, service marks, or other commercial symbols, FRANCHISEE must comply with FRANCHISOR's directions within 90 days after notice to FRANCHISEE. FRANCHISOR has no liability or obligation whatsoever with respect to FRANCHISEE's modification or discontinuance of any Mark.

E.  To protect the validity and integrity of the Marks and any copyrighted material licensed under the Agreement and to assure that FRANCHISEE is properly employing them in the operation of its Franchised Business, as well as to assure that FRANCHISEE is otherwise complying with the terms of this Agreement, FRANCHISOR and its agents have the right to inspect the Franchised Business, including any vehicles and equipment used in connection with the business, and operating procedures used by FRANCHISEE and its technicians. Such inspection may be conducted at all times during

business hours. Without limiting the foregoing, FRANCHISOR may observe the manner in which FRANCHISEE is rendering its ColorAll services and conducting its operations, confer with FRANCHISEE's staff, customers and former customers, and select materials and supplies at no cost to FRANCHISEE for test of content and evaluation purposes to make certain that the materials and supplies are satisfactory and meet FRANCHISOR's quality-control provisions and performance standards.

## V.  CONFIDENTIAL OPERATING MANUAL AND BULLETINS

A.  At the time of training, FRANCHISOR will loan to FRANCHISEE for the term of the franchise one copy of the ColorAll operating manual (the "Confidential Operating Manual") containing mandatory and suggested specifications, standards, operating procedures and rules FRANCHISOR prescribes from time to time for ColorAll Franchised Businesses and information relative to FRANCHISOR's other obligations under this Agreement. FRANCHISOR may add to and otherwise modify the Confidential Operating Manual to reflect changes in the specifications, standards, operating procedures and rules FRANCHISOR prescribes for ColorAll Franchised Businesses. No such addition or modification may alter FRANCHISEE's fundamental status and rights under this Franchise Agreement.

B.  The Confidential Operating Manual, at all times, remains the sole property of FRANCHISOR. FRANCHISEE must promptly return the Confidential Operating Manual upon the expiration or sooner termination of this Agreement.

C.  The Confidential Operating Manual contains FRANCHISOR'S proprietary information. FRANCHISEE must keep such information confidential during the term of this Agreement and after the expiration or sooner termination of this Agreement. FRANCHISEE, at all times, must ensure that its copy of the Confidential Operating Manual contains all updates made by FRANCHISOR. At all times that authorized personnel are not using the Confidential Operating Manual, FRANCHISEE must maintain the Confidential Operating Manual in a secured area at its principal office, and may grant only authorized personnel, as defined in the Confidential Operating Manual, access to the key or lock combination of such receptacle. If any dispute arises as to the contents of the Confidential Operating Manual, the terms of the master copy of the Confidential Operating Manual FRANCHISOR maintains at FRANCHISOR's home office is controlling. All references in this Agreement to the Confidential Operating Manual include any manuals, publications, notices, and/or announcements, FRANCHISOR may designate as being part of the Confidential Operating Manual.

D.  FRANCHISOR may issue service bulletins and business bulletins (collectively, "Bulletins"). These Bulletins detail service and product applications and marketing methods.

## VI.  CONFIDENTIAL INFORMATION

A.  FRANCHISEE's and its owners', officers', directors', and partners', if any, knowledge of the operation of a ColorAll Franchised Business—including, without limitation, marketing strategies and techniques, product formulae, standards and operating procedures of the ColorAll Franchised Business—will be derived exclusively from information FRANCHISOR discloses to FRANCHISEE. Any and all information, knowledge and know-how, provided by or for the FRANCHISOR regarding the System, the FRANCHISEE, or the FRANCHISOR not part of the public domain, including, without limitation, the Confidential Operating Manual, Bulletins, drawings, materials, equipment, equipment lists, product lists, customer lists, techniques, product formulae, vendor lists, and other data which FRANCHISOR designates as confidential are considered confidential and trade secrets for purposes of this Agreement (collectively, the "Confidential Information"). Confidential Information includes information relating to any changes made for FRANCHISEE to FRANCHISOR's current-standard form of Franchise Agreement as reflected in this Agreement or any addendum to this Agreement. Confidential Information does not include information which FRANCHISEE can demonstrate, to FRANCHISOR'S satisfaction, lawfully came to its attention prior to disclosure thereof by FRANCHISOR; or which, at the time of disclosure by FRANCHISOR to FRANCHISEE, had lawfully become a part of the public domain, through publication or communication by others; or which, after disclosure to FRANCHISEE by FRANCHISOR,

lawfully becomes a part of the public domain, through publication or communication by others. FRANCHISEE must ensure that it and its owners, officers, directors, and employees maintain the absolute confidentiality of all Confidential Information during and after the term of the franchise and that neither it nor such other persons use any such information in any other business or in any manner FRANCHISOR does not specifically authorize or approve in writing. FRANCHISEE and its owners, officers, directors, and employees may divulge such trade secrets and confidential information only to the extent necessary, and only to such of its employees as must have access to it, to operate the Franchised Business.

B. Because of the special and unique nature of the Confidential Information, FRANCHISOR is entitled to immediate equitable remedies, including, but not limited to, restraining orders and injunctive relief to safeguard such information of FRANCHISOR. Money damages alone would be an insufficient remedy with which to compensate FRANCHISOR for any breach of the terms of Sections IV., V. and VI. of this Agreement. Furthermore, FRANCHISEE must promptly obtain signed nondisclosure agreements (in form acceptable to FRANCHISOR), and deliver copies of such agreements to FRANCHISOR, from all of FRANCHISEE's managers, technicians, and any other employee having access to any Confidential Information and all of FRANCHISEE's owners, officers, and directors. FRANCHISEE must have such persons execute nondisclosure agreements before starting their relationship with FRANCHISEE. FRANCHISEE must strictly enforce such nondisclosure agreements.

C. Any ideas, methods, procedures, techniques, and customer lists relating to the operation of the Franchised Business that FRANCHISEE develops during the term of this Agreement are FRANCHISOR's sole property and are considered Confidential Information. FRANCHISOR may use any or all such ideas, methods, procedures, techniques, and customer lists as part of the System, as modified by FRANCHISOR from time to time.

## VII.    MODIFICATION OF THE SYSTEM

From time to time FRANCHISOR may change or modify the System presently identified by the Marks, including, without limitation, by adopting and using new or modified trade names, trademarks, service marks or copyrighted materials, new products, new equipment, new signage or new techniques. FRANCHISEE must accept, use, and display any such changes in the System, as if they were part of this Agreement at the time of execution of their Agreement. FRANCHISEE must make such expenditures as are reasonably required to effect such changes or modifications in the System. FRANCHISEE must not change, modify or alter the System in any way without the prior approval of FRANCHISOR, which may be given at FRANCHISOR's sole discretion.

Because complete and detailed uniformity under many varying conditions may not be possible or practical, FRANCHISOR reserves the right to vary standards for any ColorAll franchisee based upon the peculiarities of the particular territory or circumstance, density of population, business potential, population of trade area, existing business practices or any other condition which FRANCHISOR considers of importance to the successful operation of such franchisee's business. FRANCHISEE is not entitled to require FRANCHISOR to grant FRANCHISEE a like or similar variation. FRANCHISOR may also vary the System as it deems appropriate in its sole discretion to accommodate local conditions or restrictions affecting FRANCHISEE's Franchised Business.

## VIII.    ROYALTY FEE

A. FRANCHISEE must pay, without demand, offset, credit or deduction of any nature, to FRANCHISOR a monthly Royalty Fee of 10% of the Gross Sales (defined below) derived from the Franchised Business. Beginning, however, with the third month of operation of the Franchised Business, and irrespective of the amount of Gross Sales, FRANCHISEE must pay a minimum monthly Royalty Fee of $1,000. FRANCHISEE must pay the Royalty Fee monthly in the manner specified below or as otherwise prescribed in the Confidential Operating Manual.

1. FRANCHISOR must receive from FRANCHISEE by the 25th day of each month, a correct statement of FRANCHISEE's Gross Sales for the preceding calendar month on FRANCHISOR's standard form signed by FRANCHISEE, together with the Royalty based on the Gross Sales reported in that statement of Gross Sales.

2. The term "Gross Sales" means the total of all sales of products and services to FRANCHISEE's customers. The term does not include sales taxes, use taxes, or service taxes collected and paid to the appropriate taxing authority. Gross Sales include, without limitation, transactions involving cash, credit, checks, gift certificates, services, property or any other means of exchange. Gross Sales involving property or services are valued at the prices applicable, at the time such items are received, to the products sold or services rendered by the FRANCHISEE in exchange for such property or services. Gross Sales are considered received by FRANCHISEE at the time the goods or services from which they derive are delivered or rendered or at the time the relevant sale takes place, whichever first occurs. Receivables not collected within 120 days after the original-invoice date are deducted from the computation of Gross Sales to the extent that such receivables represent amounts previously included in Gross Sales on which Royalty Fees were paid. Subsequent collection of such delinquent amounts, if any, must be immediately reported in Gross Sales.

B. Notwithstanding any designation by FRANCHISEE, FRANCHISOR has the sole discretion to apply any payments by FRANCHISEE to any past due Royalty Fees, interest, or other indebtedness.

C. To secure the payment of all monies that FRANCHISEE must pay FRANCHISOR under this Agreement and any other agreements that the parties may enter, and all of FRANCHISEE's other duties under such agreements, the FRANCHISEE grants FRANCHISOR a security interest in all its ColorAll assets.

## IX.    ACCOUNTING AND RECORDS

A. FRANCHISEE must maintain complete and accurate books, records, and accounts in accordance with FRANCHISOR's accounting system and other requirements set forth in the Confidential Operating Manual. For at least six years after preparation (without regard to the earlier expiration or termination of this Agreement), FRANCHISEE must retain all books and records related to the Franchised Business, including, without limitation, sales receipts, purchase orders, invoices, payroll records, check stubs, sales tax records and returns, cash receipts and disbursement journals and general ledgers.

B. Within 90 days after the end of each fiscal year during the term of this Agreement, FRANCHISEE must, at its expense, submit to FRANCHISOR a profit and loss statement for such fiscal year and a balance sheet as of the last day of such fiscal year, prepared on a cash basis including all adjustments necessary for fair presentation of the financial statements. FRANCHISEE must certify that such financial statements are true and correct. Such statements must be accompanied by a review opinion by an independent accountant approved by FRANCHISOR.

C. FRANCHISEE must submit to FRANCHISOR such periodic reports, forms and records in the manner and at the time specified in the Confidential Operating Manual. Without limiting the generality of the foregoing, FRANCHISEE must submit weekly sales and collection reports containing such information and in such form as FRANCHISOR prescribes in writing.

D. FRANCHISOR and its designated agents have the right at all times to examine and copy, at FRANCHISOR's expense, the FRANCHISEE's books, records, and tax returns. Should FRANCHISEE refuse such examination, FRANCHISOR has the right to terminate the Franchise Agreement. Without limiting the generality of the foregoing, FRANCHISOR may examine and copy FRANCHISEE's canceled checks, check ledgers and bank statements, as well as all items referred to in the last sentence of Section IXA. FRANCHISOR also has the right, at any time, to have an independent audit made of FRANCHISEE's books and records at FRANCHISOR's expense. If an inspection reveals that FRANCHISEE understated any payments due to FRANCHISOR in any report to FRANCHISOR, then

FRANCHISEE must immediately pay FRANCHISOR the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the lesser of 1.5% per month or the maximum rate permitted by law. If an inspection discloses an understatement of more than 5 percent of actual Gross Sales for at least 3 months during any consecutive 12 month period, FRANCHISEE must, in addition, reimburse FRANCHISOR for any costs and expenses connected with the inspection (including, without limitation, reasonable travel, accounting and attorneys' fees). If FRANCHISEE underreports by such amount or greater, at all times thereafter, FRANCHISOR may require annual financial statements for any fiscal year, prepared in accordance with generally accepted accounting practices and audited by an approved independent certified public accounting firm at FRANCHISEE's expense. FRANCHISEE must deliver such audited financial statements within 120 days of FRANCHISOR's written request.

E.  Without limiting the generality of any provision set forth in IX.D., if FRANCHISOR believes that FRANCHISEE is not accurately reporting all billable work, or is billing or is collecting work for himself, FRANCHISOR or its designee may elect to inspect and examine FRANCHISEE's business operations, and examine and copy all his financial records.  In the event of such conduct by FRANCHISEE, FRANCHISEE must on demand, reimburse FRANCHISOR for all expenses it incurs (including, without limitation, accounting and legal fees, administrative expenses, and collection costs) in connection with such inspection, examination, and copying. Such reimbursement will in no event be less than $2,500.

F.  All Royalty Fees, and other amounts that FRANCHISEE owes to FRANCHISOR, bear interest from the due date at the highest applicable legal rate. Nothing in this Section means that FRANCHISOR agrees to accept such payments after due or implies a commitment by FRANCHISOR to extend credit to, or otherwise finance FRANCHISEE's operation of, the Franchised Business. FRANCHISOR's failure, on one or more occasions, to demand interest when due is not a waiver of such right by FRANCHISOR.

G.  FRANCHISEE must establish and maintain throughout the term a single bank account into which FRANCHISEE must deposit all receipts from sales of products and services made in connection with the Franchised Business.

## X.    STANDARDS OF QUALITY AND PERFORMANCE

A.  FRANCHISEE must comply with all requirements set forth in this Agreement, the Confidential Operating Manual and other written policies FRANCHISOR supplies to FRANCHISEE. Mandatory specifications, standards, operating procedures and rules FRANCHISOR prescribes from time to time in the Confidential Operating Manual, or otherwise communicated to FRANCHISEE in writing constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include all such mandatory specifications, standards and operating procedures and rules. Subject to the terms of this Agreement, FRANCHISEE must comply with the entire System including, but not limited to, the provisions of this Section X. FRANCHISEE must not use any advertising or promotional materials that have not been preapproved by FRANCHISOR in writing.

B.  FRANCHISEE must obtain and use all equipment and other items that FRANCHISOR requires and offer for sale and sell all products and services that FRANCHISOR, from time to time, authorizes. FRANCHISEE must not offer for sale or sell any other products or services. FRANCHISOR may add additional and/or change authorized products and services. If FRANCHISOR changes and/or adds additional authorized services, it will not require, in addition to any expenditures FRANCHISEE has elected to make, FRANCHISEE to spend more than $4,000 per year (on an average cumulative basis) on any equipment, supplies and initial inventory needed to implement such changes and additions. If FRANCHISOR requests, FRANCHISEE must acquire and use such computers and proprietary software for such business purposes as FRANCHISOR designates from time to time.

C.  FRANCHISOR will provide to FRANCHISEE a list of approved manufacturers, contractors, distributors and other suppliers ("Approved Suppliers List") and approved inventory products, equipment, signs, stationery, supplies, and other products or services necessary to operate the Franchised Business

("Approved Supplies List"). FRANCHISOR may revise the Approved Suppliers List and Approved Supplies List from time to time in its sole discretion. FRANCHISOR, however, might not have an Approved Suppliers List or Approved Supplies List with suppliers, products, or services near the FRANCHISEE's Franchised Business. FRANCHISEE may be required to source its own suppliers, products, or services, subject to FRANCHISOR's prior written approval. If FRANCHISEE proposes to use or offer for sale in connection with the Franchised Business any product or service that is not then approved by FRANCHISOR, or to purchase any product or service from a supplier that is not then designated by FRANCHISOR as an approved supplier, FRANCHISEE must first notify FRANCHISOR and must upon request by FRANCHISOR submit samples and such other information as FRANCHISOR requires for examination and/or testing or to otherwise determine whether such product or service, or such supplier, meets its specifications and quality standards. FRANCHISOR, at its option, may charge FRANCHISEE a fee in connection with such examination and/or testing that will not exceed the reasonable cost of the examination and testing. FRANCHISOR may reject or accept in its discretion FRANCHISEE's request for approval. FRANCHISOR reserves the right to re-inspect the facilities and products of any supplier of an approved item and to revoke its approval of any supplier, product or service that fails to continue to meet any of FRANCHISOR's criteria.

D. FRANCHISOR will provide FRANCHISEE with an initial supply of ColorAll products and other materials, a list of which will be provided upon the execution of this Agreement.

E. All products, services and suppliers FRANCHISEE uses in operating the Franchised Business that are not specifically required to be used in accordance with FRANCHISOR's Approved Supplies List and Approved Suppliers List must conform to the specifications and quality standards, if any, FRANCHISOR establishes from time to time.

F. FRANCHISEE must secure and maintain in force any required licenses, permits and certificates relating to the operation of the Franchised Business and must operate the Franchised Business in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all government regulations.

G. FRANCHISEE must refrain from any operating, advertising, or promotional practice that is unethical or may be injurious to the business of FRANCHISOR and/or other Franchised Businesses or to the goodwill associated with the Marks as FRANCHISOR determines. Except with respect to payment obligations that FRANCHISEE disputes in good faith, FRANCHISEE must pay its suppliers, lenders and other creditors on a timely basis and maintain a good credit standing.

H. FRANCHISEE must comply with FRANCHISOR'S warranty specifications, which include a 100% satisfaction guarantee on all work performed.

I. At all times, FRANCHISEE must maintain an inventory of products, materials, and supplies that will permit it to operate the Franchised Business at capacity.

J. FRANCHISEE must notify FRANCHISOR in writing within five days of the start of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality, to which FRANCHISEE, its general partners (if FRANCHISEE is a partnership) or its officers or directors or holders of five percent or more of FRANCHISEE's securities of FRANCHISEE or any corporation directly or indirectly controlling FRANCHISEE (if FRANCHISEE is a corporation) are a party that may adversely affect the operation or financial condition of the FRANCHISEE or the Franchised Business.

K. When FRANCHISOR satisfies its preopening obligations to FRANCHISEE, FRANCHISEE must provide written certification thereof to FRANCHISOR. The certification must be in the form FRANCHISOR reasonably requests. The term "Preopening Obligations" means such of FRANCHISOR's obligations under this Agreement to FRANCHISEE that FRANCHISOR must perform before FRANCHISEE must begin operating the Franchised Business.

## XI.     INSURANCE

A.  During the term of this Agreement, FRANCHISEE must, at its expense, procure and maintain in full force an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their respective officers, directors, partners and employees against any loss, liability, personal injury, death, or property damage or expense whatsoever arising or occurring in connection with the Franchised Business, as FRANCHISOR reasonably requires for its own and FRANCHISEE's protection.  FRANCHISOR must be named an additional insured in such policy or policies.

B.  Such policy or policies must be written by an insurance company satisfactory to FRANCHISOR, and must include, at a minimum the following:

1.  Comprehensive general liability insurance (including, without limitation, bodily injury, death, and property damage and destruction coverage), with at least a single limit coverage of $500,000 per occurrence.

2.  Such other insurance as required by law in the jurisdiction in which the Franchised Business is located and operated.  FRANCHISEE must ensure that its manager and other staff and personnel are covered under any such required policies during all pre-opening training, as well as at all times thereafter during the term of this Agreement.

C.  The insurance afforded by the policy or policies required under this Section XI. must not be limited in any way by reason of any insurance which FRANCHISOR may maintain.  Before starting operation of the Franchised Business, or of any other franchise-related activity requiring insurance, FRANCHISEE must furnish FRANCHISOR, for its approval, a Certificate of Insurance (including a paid receipt) showing compliance with the requirements of this Section.  This certificate must state that the policy or policies will not be canceled or altered, or subject to nonrenewal without at least 30 days prior written notice to FRANCHISOR and must reflect proof of payment of premiums.  FRANCHISEE's maintenance of such insurance and performance of the obligations under this Section do not relieve FRANCHISEE of liability under the indemnity provisions contained in this Agreement.  Minimum limits and types of coverage as required above may be modified or supplemented from time to time by FRANCHISOR by written notice to FRANCHISEE.

D.  If FRANCHISEE, for any reason, does not procure and maintain such insurance coverage as required by this Agreement, FRANCHISOR has the right (but not the obligation) to immediately procure such insurance coverage and to charge it to FRANCHISEE.  FRANCHISEE must pay such charges, together with a reasonable fee for expenses incurred by FRANCHISOR in connection with the procurement of such insurance, immediately upon notice.

E.  All liability insurance policies procured and maintained by the FRANCHISEE must require the insurance companies to provide and pay for legal counsel to defend any legal actions, lawsuits or claims brought against the FRANCHISEE, FRANCHISOR or their respective officers, directors and employers.

## XII.     COVENANTS

A.  At all times during the term of this Agreement, FRANCHISEE or FRANCHISEE's manager must devote full time, energy and best efforts to the management, operation, and promotion of the Franchised Business.  If FRANCHISEE retains a manager, he or she must complete initial training to FRANCHISOR's satisfaction.

B.  During the term of this Agreement and for a period of 24 months thereafter, except as FRANCHISOR otherwise approves in writing, FRANCHISEE must not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or other entity:

1. Employ or seek to employ any person who is at that time employed (or formerly employed within the last three months) by FRANCHISOR, FRANCHISOR's affiliate, or by any other franchisee of FRANCHISOR, or otherwise directly or indirectly seek to induce such person to leave his or her employment nor attempt to encourage any supplier, consultant, representative or other material business contact of FRANCHISOR to terminate or otherwise disrupt its relationship with FRANCHISOR, its affiliates or its franchisees. If FRANCHISEE violates this subsection by employing any person then holding a managerial or technical position, due to the difficulty in determining actual damages and not as a penalty, FRANCHISOR is entitled to liquidated damages from FRANCHISEE equal to twice the annual salary arising from the new employment of the employee involved, plus reimbursement of all costs and attorneys' fees incurred.

2. Own, operate, maintain, engage in, consult with, lease or lend to, or have any interest in any business involving color reconditioning of interior and exterior components of motor vehicles—on either a mobile or stationary basis—or any other business similar to that then conducted by FRANCHISOR or its franchisees (including any such business, other than a ColorAll Franchised Business, operated by FRANCHISEE prior to entry into this Agreement unless FRANCHISOR consents otherwise in writing). The terms of this subsection 2. apply (a) during the term of this Agreement, to any area within the United States; and (b) during the 24 months thereafter, to any area within 100 miles of the territory serviced by any ColorAll business operated by FRANCHISOR or any of its affiliates or within 100 miles of the protected territory of any ColorAll franchise then open or for which a binding agreement to open has been entered.

C. Each of the foregoing covenants in 1. and 2. above, must be construed as independent of any other covenant or provision of this Agreement. If any court (or arbitration proceeding) holds in a final decision that the time or territory or any other provision stated in this Section XII constitutes an unreasonable restriction upon FRANCHISEE, the provisions of this Section XII must not be rendered void, but must apply as to time and territory or to such other extent as such court (or arbitration proceeding) may determine or indicate constitutes a reasonable restriction under the circumstances involved. The term of the foregoing covenants in 1. and 2. above must be suspended during any period that FRANCHISEE is in breach of Section XII.B.

D. FRANCHISOR has the right, in its sole discretion, to reduce the scope of any covenant, or any portion thereof, set forth in this Section XII, effective immediately upon FRANCHISEE's receipt of written notice thereof, and FRANCHISEE must comply immediately with any covenant as so reduced.

E. FRANCHISEE must promptly obtain signed agreements containing similar covenants (in a form satisfactory to FRANCHISOR) and deliver copies of them to FRANCHISOR from all of FRANCHISEE's managers, technicians, and any other personnel receiving training from FRANCHISOR and all of FRANCHISEE's owners, officers, and directors. FRANCHISEE must have such persons execute these agreements before starting their relationship with FRANCHISEE. FRANCHISEE must ensure that such persons strictly comply with their agreements.

## XIII. DEFAULT AND TERMINATION

A. Without notice to FRANCHISEE, this Agreement and all FRANCHISEE's rights hereunder immediately terminate if: (i) FRANCHISEE is insolvent or dissolved, (ii) a receiver or trustee for FRANCHISEE's business or assets is appointed, (iii) FRANCHISEE files a voluntary petition in bankruptcy or makes an assignment for the benefit of creditors, or (iv) an involuntary petition in bankruptcy is filed by any person against FRANCHISEE and is not dismissed within 10 days of filing.

B. On the happening of any of the following events, FRANCHISEE is in default and FRANCHISOR may, at its option, terminate this Agreement, and all FRANCHISEE'S rights under this Agreement, without affording FRANCHISEE any opportunity to cure the default, effective immediately upon notice to the FRANCHISEE:

1. FRANCHISEE loses the right to transact business in the jurisdiction where the Franchised Business is located;

2. FRANCHISEE fails to begin operating the Franchised Business within 90 days of signing this Agreement;

3. FRANCHISEE fails to pay any amount owed to FRANCHISOR or its affiliates within 15 days of delivery of written notice that payment is past due;

4. FRANCHISEE fails to comply with any requirement under this Agreement other than those referred to in Subsection 3. and does not correct such failure within 30 days after written notice of such failure is delivered to FRANCHISEE;

5. FRANCHISEE, or any officer, director, shareholder, partner, or staff of FRANCHISEE, is convicted of a felony, a crime of moral turpitude or any other crime or offense that FRANCHISOR reasonably believes is likely to have a material adverse effect on the System or the Marks, unless FRANCHISEE within 10 days after such event terminates such individual as an officer, director, shareholder, partner, or employee of the FRANCHISEE;

6. FRANCHISEE knowingly maintains false books or records, knowingly submits any false report to the FRANCHISOR, or knowingly understates its monthly Gross Sales by three percent or more;

7. FRANCHISEE, or any of its principals, misrepresented or withheld any information deemed material by the FRANCHISOR in any application submitted to FRANCHISOR for purposes of inducing FRANCHISOR to enter this Agreement;

8. FRANCHISEE has received from the FRANCHISOR 3 or more prior notices of default during any consecutive 12-month period, even if such defaults were cured;

9. FRANCHISEE, or any other person referred to in Section XV.B., attempts or purports to make any transfer in violation of the terms of Section IV., VI., or XVII;

10. FRANCHISEE abandons the Franchised Business or ceases to operate the Franchised Business for 14 or more consecutive days or 30 business days in any 12 month period;

11. FRANCHISEE, or any other person referred to in Sections VI. or XII., breaches any of the terms of Sections VI. or XII; or

12. FRANCHISEE fails to perform any of its obligations under Section XXIV.

C.   To the extent that the provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation, non-renewal, or the like in a manner not complying with applicable law, such provisions are not effective, and FRANCHISOR will comply with applicable law in connection with these matters.

D.   If FRANCHISEE has at all times complied with the terms of this Agreement, and if a petition in bankruptcy is filed by FRANCHISOR or such a petition is filed against FRANCHISOR and such petition is not dismissed within 45 days of filing, FRANCHISEE may, at its option, terminate this Agreement by providing FRANCHISOR with written notice of termination.

## XIV.   RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon expiration or sooner termination, this Agreement and all FRANCHISEE's rights under this Agreement terminate, and:

A.  FRANCHISEE must immediately cease operating the Franchised Business and must not thereafter, directly or indirectly, represent itself to the public or hold itself out as a present or former franchisee of FRANCHISOR.  If FRANCHISEE continues to operate the Franchised Business in breach of this requirement, in addition to, and not in limitation of, FRANCHISOR's other rights, FRANCHISEE must pay FRANCHISOR a Royalty Fee of 10% of Gross Sales, in the same manner and at the same time as otherwise required during the term of the franchise, until such time as FRANCHISEE is no longer in breach of such commitment to cease operations.  If FRANCHISOR accepts such fee, FRANCHISEE is not thereby entitled to continue operating in breach of this Agreement, nor is FRANCHISOR thereby barred from seeking all available remedies at law and equity for such breach and any continuation thereof.

B.  FRANCHISEE must immediately and permanently cease to use, by advertising or in any other manner whatsoever, any confidential methods, procedures, and techniques associated with the System; the Marks and distinctive forms, slogans, signs, symbols, logos, or devices associated with the System.  In particular, FRANCHISEE must cease to use, without limitation, all signs, advertising materials, stationery, forms, and any other articles which display the Marks or which are associated with the System.  FRANCHISEE must not use the Marks in any manner to disparage FRANCHISOR or its reputation nor take any action that would harm or jeopardize the Marks in any way.

C.  At FRANCHISOR's request, FRANCHISEE must take such action necessary to cancel or assign to FRANCHISOR or FRANCHISOR's designee, any registered or permitted user agreement and assumed-name rights or equivalent registration filed with any governmental authorities that contain the name "ColorAll" or any other Mark.    FRANCHISEE must furnish FRANCHISOR with evidence satisfactory to FRANCHISOR of compliance with this obligation within 30 days after termination or expiration of this Agreement.

D.  FRANCHISEE must not use any reproduction, counterfeit, copy or colorable imitation of the Marks either in connection with any other activity or the promotion thereof, that is likely to cause confusion, mistake or deception, or which is likely to dilute FRANCHISOR's rights in the Marks and must not use any designation of origin or description or representation that falsely suggests or represents an association or connection with FRANCHISOR that constitutes unfair competition.  FRANCHISEE must make such modifications or alterations to the vehicles used in the Franchised Business immediately upon termination or expiration of this Agreement as needed to prevent any association with FRANCHISOR or the System, and must make such specific additional changes to such vehicles as FRANCHISOR reasonably requests for that purpose, including, without limitation, removal of all distinctive features and any signage and colors that may identify the System.

E.  FRANCHISEE must promptly pay all sums owing to FRANCHISOR.  If termination of this Agreement occurs because of a default of FRANCHISEE, such sums include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR as a result of the default.

F.  FRANCHISEE must immediately return to FRANCHISOR the Confidential Operating Manual, customer lists, vendor lists, forms, records, files, instructions, brochures, agreements, and any and all other materials provided to FRANCHISEE, including all copies thereof, relating to operating the Franchised Business (all of which are acknowledged to be FRANCHISOR's property).  If, for any reason, FRANCHISEE fails to return the Confidential Operating Manual to FRANCHISOR, FRANCHISEE must pay FRANCHISOR $500.

G.  FRANCHISEE must cancel its telephone numbers for the Franchised Business.

H.  FRANCHISOR may, by notice of intent to do so within 30 days after termination or expiration, purchase for cash any or all assets of the Franchised Business, including vehicles, equipment, supplies, and other inventory, advertising materials, and all items bearing the Marks, at FRANCHISEE's cost or fair market value, whichever is less.  If the parties cannot agree on fair market value within a reasonable time, FRANCHISOR and FRANCHISEE must each designate an independent appraiser, which appraisers must designate a third independent appraiser.  The determination of the majority of such appraisers is

final and binding. If FRANCHISEE fails to designate an independent appraiser within 10 days after notice of the identity of FRANCHISOR's independent appraiser, then FRANCHISOR's independent appraiser will be the sole appraiser. FRANCHISOR and FRANCHISEE share equally in all appraisal fees and costs. If FRANCHISOR exercises any option to purchase as provided in this Subsection, it has the right to set off all amounts due from FRANCHISEE under this Agreement, if any, against any payment therefor.

I. FRANCHISEE must comply with the covenants contained in Section XII. of this Agreement and all other obligations which are intended to or by their nature should survive expiration or termination of this Agreement, until such obligations are satisfied or by their nature expire.

## XV. TRANSFERABILITY OF INTEREST

A. This Agreement and all rights under this Agreement may be assigned by FRANCHISOR, provided, however, that with respect to any assignment requiring subsequent performance by the assignee of the functions of FRANCHISOR, the assignee must expressly assume and agree to perform such obligations. Upon such assumption by the assignee, FRANCHISOR is released from all its obligations under this Agreement. Nothing contained in this Agreement requires FRANCHISOR to remain in the business if FRANCHISOR exercises its rights hereunder to assign this Agreement or any of its rights hereunder.

B. No FRANCHISEE, partner of FRANCHISEE (if FRANCHISEE is a partnership), or shareholder of FRANCHISEE (if FRANCHISEE is a corporation), nor any other person with an ownership interest (direct or indirect) in FRANCHISEE, may, without FRANCHISOR's prior written consent, by operation of law or otherwise, directly or indirectly, sell, assign, transfer, convey, give away, or encumber to any person, all or any part of its interest in this Agreement, in franchise or in any person which owns any interest in franchise, nor offer, permit, or suffer the same to be sold, assigned, transferred, conveyed, given away, pledged, used as security, or encumbered in any way to any person, without FRANCHISOR's prior written consent. FRANCHISEE may not without the prior written consent of FRANCHISOR fractionalize any of the rights of FRANCHISEE granted under this Agreement. Any purported assignment of any of the above interests in franchise or of FRANCHISEE's rights herein to which FRANCHISOR has not consented in writing is void and constitutes a default under this Agreement.

So long as FRANCHISEE (including, without limitation, its owners, directors and officers executing this Agreement) is in full compliance with this Agreement and any other agreements to which FRANCHISEE and FRANCHISOR are parties, FRANCHISOR will not unreasonably withhold its approval of transfer to proposed transferees if FRANCHISOR determines, in its discretion, that such persons: (i) are of good moral character and have sufficient business experience, aptitude and financial resources, (ii) otherwise meet FRANCHISOR's then-applicable standards for franchisees; and (iii) are willing to assume all obligations of FRANCHISEE hereunder and are willing, together with all owners of any interest in the transferee, to execute and be bound by all provisions of FRANCHISOR's then-current form of Franchise Agreement for a term equal to the remaining term hereof. FRANCHISEE remains liable jointly and severally for all obligations of the transferee, as well as for all obligations of FRANCHISEE accrued up to the time of transfer. Consent to any transfer is not deemed a consent for any future transfer.

In addition to the above requirements, as a further condition to granting its approval of any such transfer, FRANCHISOR may impose other conditions it deems reasonably necessary, such as requiring FRANCHISEE or the transferee to pay to FRANCHISOR its then-current transfer fee to defray expenses incurred by FRANCHISOR in connection with the transfer, legal and accounting fees, credit and other investigation charges and evaluation of the transferee and the terms of the transfer. Currently, the transfer fee is $2,500 for each transferee presented to the FRANCHISOR. Transfer fees are nonrefundable regardless of whether a transfer is consummated.

FRANCHISOR has the right to require FRANCHISEE and its owners to execute a general release of all claims against FRANCHISOR and its owners, directors, officers, successors and assigns, in a form

satisfactory to FRANCHISOR as a condition to its approval of the assignment of this Agreement or ownership (direct or indirect) of FRANCHISEE.

FRANCHISEE is considered in default under this Agreement if any of its owners fail to comply with any of the terms of this Section XV. B.1

C.  FRANCHISEE may assign this Agreement to a corporation that conducts no business other than the business contemplated hereunder, which is actively managed by FRANCHISEE and in which FRANCHISEE owns and controls not less than 51% of the equity and voting power of such corporation and the only other owners are FRANCHISEE's immediate family members or other persons disclosed to and approved in writing by FRANCHISOR, provided that (i) such corporation, and all shareholders thereof, execute an assignment agreement in form approved by FRANCHISOR undertaking to be bound jointly and severally by all provisions of this Agreement, (ii) all issued and outstanding stock certificates of such corporation bear a legend reflecting or referring to the restrictions of transfer contained in this Agreement, (iii) and, at the time of transfer, the FRANCHISEE is in compliance with its obligations to the FRANCHISOR.  No new shares of voting stock in the transferee corporation may be issued without obtaining FRANCHISOR's prior written consent and then only upon disclosure of the terms and conditions herein being made to the prospective new holders of the stock.

D.  All financial obligations that a transferee owes to FRANCHISEE, or any of its owners, in connection with the transfer this Agreement, or any interest therein, or in any ownership interest in FRANCHISEE or in any of its assets are subordinated—in priority of obligation and time of payment—to that transferee's financial obligations to FRANCHISOR.  This subordination is self executing.  But the transferee must execute and deliver to FRANCHISOR any further documents it may request to evidence such subordination.

## XVI.    DEATH OR INCAPACITY OF FRANCHISEE

A.  Upon the incapacity of any individual whose death would cause a transfer otherwise prohibited under Section XV.B., or upon such individual's death, the heirs, beneficiaries, devisees, or legal representatives of said individual must, within 180 days of such event:

1.  Apply to FRANCHISOR for the right to continue to operate the franchise for the duration of the term of this Agreement.  FRANCHISOR will grant this right if FRANCHISEE fulfills all of the conditions set forth in Section XV.B. of this Agreement; or

2.  Sell, assign, transfer, or convey the deceased or incapacitated individual's interest in compliance with the provisions of Sections XV.B. and XVII. of this Agreement.  If, however, a proper and timely application for the right to continue to operate has been made and rejected, the 180 days to sell, assign, transfer or convey will be computed from the date of said rejection.  For purposes of this Section, FRANCHISOR's failure to approve in writing an application made under Section XVI.A.1. within 180 days of death or incapacity is considered a rejection made on the last day of such period.

B.  Upon the death or incapacity of any individual described in Section XVI.A., if the provisions of Section XVI.A. have not been fulfilled within the time provided, all FRANCHISEE's rights under this Agreement will, effective immediately on FRANCHISOR's delivery of notice, terminate and FRANCHISOR has the option to purchase the Franchised Business in accordance with Section XIV.H. of this Agreement.

C.  For purposes of this Agreement, an individual is considered incapacitated if, in the reasonable discretion of FRANCHISOR, such person, as a result of physical or mental disability, is unable to perform substantially the same services for the Franchised Business, as that person performed prior to such physical or mental disability, for a period of at least 90 days in any 12 consecutive months.

## XVII.    RIGHT OF FIRST REFUSAL

If FRANCHISEE or its owners at any time desire to sell the rights under this Agreement or any of their respective ownership interests in FRANCHISEE, or any of FRANCHISEE's assets (except in the ordinary course of business), FRANCHISEE or its owners must, as a condition to such sale, obtain a bona fide, executed written offer from a responsible and fully-disclosed purchaser and submit an exact copy of such offer to FRANCHISOR, who will, for a period of 30 days from the date of delivery of such offer, have the right, exercisable by written notice to FRANCHISEE or its owners, to purchase such rights under this Agreement or such ownership interests for the price and on the terms contained in such offer, provided that FRANCHISOR may substitute cash for any form of payment proposed in such offer and that FRANCHISOR will have not less than 60 days to prepare for closing. If FRANCHISOR does not exercise this right of first refusal, FRANCHISEE or its owners, as applicable, may complete the sale of such interest in this Agreement or such ownership interest, subject to FRANCHISOR's approval of the purchaser as provided in Section XV.B. herein, provided that if such sale is not completed within 60 days after delivery of such offer to FRANCHISOR, FRANCHISOR will again have the right of first refusal provided. FRANCHISEE will be considered in default under this Agreement for any failure of an owner to comply with any of the terms of this Section.

## XVIII.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.  This Agreement does not constitute FRANCHISEE as an agent, legal representative, joint venturer, partner, employee, or servant of FRANCHISOR for any purpose whatsoever.  FRANCHISEE must not represent to third parties that it is an agent of FRANCHISOR.  FRANCHISEE is an independent contractor and, unless specifically authorized herein, neither party is  authorized to make any contract, agreement, warranty or representation on behalf of  the other, or to create any obligation, express or implied, on behalf of  the other.

B.  FRANCHISEE must prominently display on all customer invoices and other materials used with customers, as FRANCHISOR directs, a statement that clearly indicates that the Franchised Business is independently owned and operated by FRANCHISEE as an independent franchise of FRANCHISOR.

C.  FRANCHISEE must defend at its own cost and indemnify and hold harmless FRANCHISOR, its shareholders, directors, officers, employees, agents, and representatives from and against any and all losses, claims,  costs, expenses (including attorneys' fees), damages and liabilities, however caused, resulting directly or indirectly from or pertaining to the ownership, use, condition, or construction, equipping, maintenance or operation of the Franchised Business.  Such loss, claims, costs, expenses, damages and liabilities include, without limitation, and those arising from the death or injury to any person or arising from damage to the property of FRANCHISEE or FRANCHISOR, their agents or employees, or any third person, firm or corporation, except to the extent such losses, claims, costs, expenses, damages, or liabilities were caused mainly through the negligence or intentional misconduct of FRANCHISOR or any of its agents or employees.  The terms of this Section shall survive any termination or expiration of the Franchise Agreement.

## XIX.    CAVEAT

**FRANCHISEE's success in owning and operating the Franchised Business is speculative and will depend on many factors—including, to a large extent, FRANCHISEE's independent business ability and its active participation in the daily affairs of the Franchised Business, as well as its ability to collaborate effectively with the technicians and Technical Franchisees in its Protected Territory.  No representations or promises, express or implied (including without limitation any representation or promise relating to income or profit), have been made by FRANCHISOR or any employee, broker or representative of the franchisor, to induce FRANCHISEE to enter into this Agreement except as specifically included in this Agreement.  No employee, officer, director, broker or representative is authorized to do otherwise. FRANCHISOR's approval of the Protected Territory is not a representation or warranty—express or implied—that the Franchised Business will be successful or profitable.**

## XX.   APPLICABLE LAW; MEDIATION AND ARBITRATION

A.  This Agreement takes effect only upon its acceptance and execution by FRANCHISOR at its principal office in Broward County, Florida and must be interpreted and construed under the laws of such state, without regard to principles of conflict of laws, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15, U.S.C. Section 1051 et seq).

B.  This Agreement is entered in Broward County, Florida and any action sought to be brought by either party for enforcing the terms and provisions of this Agreement, except as otherwise provided below, must be brought in the courts of record of the state of Florida in Palm Beach County or the District Court of the United States, Southern District of Florida.   The parties waive all questions of personal jurisdiction and/or venue for the purposes of carrying out this provision.

C.  No right or remedy conferred upon or reserved to FRANCHISOR or FRANCHISEE by this Agreement is intended to be, nor be considered, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

D.  Nothing contained in this Agreement may bar or delay FRANCHISOR's right to seek and obtain injunctive relief against threatened or actual conduct that may cause it loss or damages under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.  FRANCHISOR need not prove actual or irreparable damages.  No bond or other security is required to be posted (or if required, the sum of one thousand dollars is deemed sufficient).  Nothing contained in this Agreement may be construed to limit or to preclude FRANCHISOR from joining with any action for injunctive or provisional relief any monetary claims that FRANCHISOR may have against FRANCHISEE that arise out of the acts or omissions to act giving rise to the action for injunctive or provisional relief.   FRANCHISOR may seek legal or equitable relief directly in the jurisdiction of FRANCHISEE's offices, territory, or residence in the event FRANCHISOR considers it necessary to expedite or more fully enforce its rights under this Agreement.

E.  The parties waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary or special damages against the other.  In the event of a dispute between them, except as otherwise provided in this Agreement, each is limited to the recovery of any actual damages sustained by it.  The parties waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either or both of them.

F.  If a dispute arises in any way related to this Agreement, as soon as mutually convenient, the parties must attempt in good-faith to resolve the dispute.  FRANCHISOR  has implemented the following dispute resolution procedure prior to any mediation or arbitration taking place:  First, by meeting at FRANCHISOR's principal offices, then if no resolution, secondly, a meeting before the ColorAll Franchise Advisory Council (CFAC), an independent association of the ColorAll franchisees or a CFAC committee established for this purpose.  Any party that fails to attend or participate in such meetings in accordance with this provision may not begin any mediation or arbitration to resolve the underlying dispute.  At these meetings, each party must be represented by a person who is authorized to resolve the dispute on that party's behalf and to bind the party to any agreed-upon resolution.  Each party must detail what it believes to be the nature of the dispute—including the objective facts and the provisions in this Agreement on which the dispute is based—and how the dispute may be satisfactorily resolved.  If the parties resolve the dispute at either of these meetings, they must immediately formalize that resolution by an agreement that they both execute at such time.

G.  Subject to XX.F., in connection with any dispute arising under this Agreement, prior to any arbitration taking place, the parties must submit the controversy or claim to non-binding mediation before CPR Institute for Dispute Resolution ("CPR") under its National Franchise Mediation Program, the American Arbitration Association if the CPR is unable to conduct the mediation, or other mutually agreeable mediator.   In the event of such mediation, both parties must execute a confidentiality agreement reasonably satisfactory to the FRANCHISOR.  Upon submission, the obligation to attend

mediation in Palm Beach County, Florida is binding on both parties. The parties must attend mediation within 30 days of notice of submission to mediation. Each party will bear its own costs with respect to the mediation, except the fees for the mediator and CPR (or other agreed upon agency) will be split equally. If the parties cannot resolve their dispute by mediation, as just described, the parties must submit that dispute—even if relating to any claim that this Agreement, or any part thereof is invalid, irregular or otherwise void or voidable—to binding arbitration before the American Arbitration Association in accordance with its commercial arbitration rules.

H. The provisions of this Section are independent of any other covenant or provision of this Agreement. If a court of competent jurisdiction determines that any such provisions are unlawful in any way, that court must modify or interpret such provisions to the minimum extent necessary to comply with the law. Notwithstanding any provision of this Agreement relating to the state laws under which this Agreement is governed by and must be construed under, all issues relating to arbitrability or the enforcement of the agreement to arbitrate contained in this Agreement are governed by the United States Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal common law of arbitration.

I. Judgment upon an arbitration award may be entered in any court having competent jurisdiction and is binding, final and non-appealable. FRANCHISOR and FRANCHISEE (and their respective owners) waive, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other. In the event of a dispute between them, each party is limited to the recovery of any actual damages sustained by it.

J. Prior to any arbitration proceeding taking place, the FRANCHISOR or the FRANCHISEE may, at their respective option, elect to have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including a brief setting forth the then applicable statutory or common-law methods of measuring damages in respect of the controversy or claim being arbitrated.

K. This arbitration provision is self-executing and remains in full force after the expiration or termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding such failure to appear.

L. Mediation and/or arbitration must take place in Palm Beach County, Florida.

M. Any mediation or arbitration between the FRANCHISOR and the FRANCHISEE must be of the FRANCHISOR's and the FRANCHISEE's individual claims. None of the FRANCHISEE's claims may be mediated or arbitrated on a class-wide basis.

## XXI. ACKNOWLEDGMENTS

FRANCHISEE and all its owners signing this Agreement, represent and warrant the following:

A. FRANCHISEE has received, read and understood this Agreement and the FRANCHISOR's franchise offering circular; and that FRANCHISOR has accorded FRANCHISEE ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement.

B. FRANCHISEE has been or has had the opportunity to have been represented by its own counsel throughout the negotiations and at the execution of the Agreement. Therefore, FRANCHISEE must not assert that any provisions of the Agreement should be construed against the drafter thereof.

C. FRANCHISEE received a copy of this Agreement, the attachments hereto, if any, and agreements relating thereto, if any, with all terms completed therein, at least 5 business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges that FRANCHISEE

has received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled Information for Prospective Franchisee's Required by the Federal Trade Commission, at least 10 business days prior to the date on which this Agreement was executed or any consideration was given to FRANCHISOR.

D. With respect to all of FRANCHISEE's dealings with FRANCHISOR, its employees, brokers (if any), and other representatives act only in a representative capacity and not in an individual capacity. This Agreement, and all business dealings between FRANCHISEE and such individuals as a result of this Agreement, are solely between the FRANCHISEE and the FRANCHISOR.

E. FRANCHISEE acknowledges the Protected Territory was previously operated under a franchise agreement and FRANCHISEE has full knowledge of the circumstances attending such agreement.

## XXII. NATIONAL AND REGIONAL ACCOUNTS

If FRANCHISOR notifies FRANCHISEE of any national or regional account located within the Protected Territory, and if FRANCHISEE desires to service such account, FRANCHISEE must service such account on the terms and conditions established by FRANCHISOR. If FRANCHISEE is unable or unwilling to so service the national or regional account, FRANCHISEE must immediately notify FRANCHISOR and FRANCHISOR, or its designee, may service such national or regional account. In such circumstances, FRANCHISEE is not entitled to any compensation for any services provided by FRANCHISOR, or it designee, to the national or regional accounts. For the purposes of this Agreement, the term "national or regional account" means a customer with two or more locations, at least one of which is not located within the Protected Territory.

## XXIII. MONTHLY CAR ALLOWANCE

During the first twelve months of this Agreement, if FRANCHISEE complies at all times with the terms of this Agreement, FRANCHISOR will provide FRANCHISEE with a $300 monthly car allowance as follows:

A. FRANCHISOR will begin paying the monthly car allowance for the first month that FRANCHISEE begins operating the Franchised Business; and

B. For the first two months of operation, FRANCHISEE's right to the monthly car allowance is unconditional; thereafter, FRANCHISEE's right is conditional upon FRANCHISEE attaining monthly Gross Sales of at least $20,000 and is otherwise in compliance with its obligations to FRANCHISOR (including, without limitation, being current on all amounts being owed). For each month that FRANCHISEE attains such monthly Gross Sales and is otherwise in compliance, FRANCHISOR will pay FRANCHISEE the monthly car allowance in the next calendar month.

## XXIV. TECHNICAL FRANCHISEES

A. In accordance with FRANCHISOR's written instructions, FRANCHISEE must provide all Technical Franchisees in the Protected Territory with the following services (the "Administrative Services"):

      (i)      provide additional training;

      (ii)     supervise, coordinate, and administer Technical-Franchisee operations;

      (iii)    provide annual business planning;

      (iv)    provide billing and collection services and maintain; and provide FRANCHISOR, on a monthly basis, with accurate and complete records concerning billing and collection

services;

    (v)    on a weekly basis, pay each Technical Franchisee 60% of the billable work that it completed the previous week;

    (vi)    ensure that all Technical Franchisees strictly comply with their franchise agreements; and

    (vii)    use its best efforts to procure regular authorized customers for Technical Franchisees and annually increase the amount of business by at least 10% of that for the preceding year for the first 3 years of the term of this Agreement.

B. On FRANCHISOR's behalf, FRANCHISEE must collect monthly royalty fees from Technical Franchisees within the Protected Territory. So long as FRANCHISEE strictly complies with this Agreement, FRANCHISOR and FRANCHISEE will share the royalty fees FRANCHISEE actually collects as follows:

FRANCHISOR will retain an amount equal to 10% of the total gross sales earned by the Technical Franchisees; and, to the extent any additional royalty fees remain thereafter, FRANCHISOR will pay FRANCHISEE the remainder.

C. FRANCHISEE must remit to FRANCHISOR the amounts to which FRANCHISOR is entitled under subsection B. and may retain any remainder to which it is entitled under those subsections.

D. FRANCHISEE must indemnify FRANCHISOR and its officers, directors, stockholders employees and representatives from any actions, judgments, claims, damages, liabilities, costs, or expenses (including, without limitation reasonable attorney's fees even if related to post- judgment, appellate, or bankruptcy proceedings) that they incur or to which they become subject in connection with any claim asserted by a Technical Franchisee that relates to any of Franchisee's obligations under this Section XXIV.

E. FRANCHISEE must execute and deliver any further documents that FRANCHISOR requests to evidence FRANCHISEE's assumption of the Administrative Services, including, without limitation, the Assumption Agreement attached as Exhibit 2.

F. FRANCHISEE has the right to preapprove or disapprove the grant of a Technical Franchise to any individual, in its Protected Territory, provided that such approval or disapproval is reasonable.

## XXV.    MISCELLANEOUS

A. This Agreement and any agreements referenced herein (and the exhibits and any addendum executed by the parties concurrently herewith) represent the entire understanding between the parties concerning the subject matter hereof and supersede all other negotiations, understandings and representations, if any, made by and between the parties. No representations, inducements, promises or agreements, oral or otherwise, if any, not embodied in this Agreement are authorized or binding on either party.

B. The provisions of this Agreement may not be amended, supplemented, waived or changed orally or by conduct of the parties, but only by a written document signed by the party as to whom enforcement of any such amendment, supplement, waiver or modification is sought and making specific reference to this Agreement.

C. All of the terms and provisions of this Agreement, whether so expressed or not, are binding upon, inure to the benefit of, and are enforceable by the parties and their respective personal representatives, legal representatives, heirs, successors and permitted assigns.

D. No failure of FRANCHISOR to exercise any power reserved to it under this Agreement, or to insist upon strict compliance by FRANCHISEE with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms of this Agreement, constitutes a waiver of FRANCHISOR's right to demand exact compliance with the terms of this Agreement. If FRANCHISOR waives any particular default FRANCHISEE commits, such waiver is not binding unless in writing and executed by the party sought to be charged and will not affect or impair FRANCHISOR's right with respect to any subsequent default of the same or of a different nature. Nor may any delay, waiver, forbearance, or omission of FRANCHISOR to exercise any power or rights arising out of any breach or default by FRANCHISEE of any of the terms, provisions, or covenants hereof, affect or impair FRANCHISOR's rights nor will such constitute a waiver by FRANCHISOR of any right hereunder or of the right to declare any subsequent breach or default. Subsequent acceptance by FRANCHISOR of any payment(s) due to it hereunder must not be considered a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any terms of this Agreement.

E. All notices, requests, demands, consents and other communications required or permitted under this Agreement must be in writing (including telex and telegraphic communication) and must be (as elected by the person giving such notice) hand delivered by national or messenger or courier service, telecommunicated, or mailed (airmail if international) by registered or certified mail (postage prepaid), return receipt requested, addressed to FRANCHISOR or FRANCHISEE, as the case may be, at the applicable party's respective address specified on page 1 of this Agreement, or to such other address as any party may designate by notice complying with the terms of this Section. Each such notice is deemed delivered: (a) on the date delivered if by personal delivery; (b) on the date of transmission with confirmed answer back if by telefax or other telegraphic method; or (c) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities or courier service as not deliverable, as the case may be, if mailed or couriered.

F. The headings and subheadings contained in this Agreement are for convenience of reference only, and not to be considered a part hereof and do not limit or otherwise affect in any way the meaning or interpretation of this Agreement.

G. If any provision of this Agreement or any other agreement entered into pursuant to this Agreement is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision is inapplicable and considered omitted to the extent so contrary, prohibited or invalid, but the remainder of this Agreement is not invalidated thereby and is given full force and effect so far as possible. If any provision of this Agreement may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision has the meaning that renders it valid and enforceable.

In addition to, and without limiting the provisions of the foregoing paragraph, if any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or non-renewal of this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by the FRANCHISOR is invalid or unenforceable, the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions hereof. The FRANCHISOR has the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable.

H. This Agreement may be executed in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same instrument. Confirmation of execution by telex or by telecopy facsimile signature page is binding upon any party so confirming or telecopying.

I. Other present and/or future ColorAll franchisees may operate under franchise agreements with terms and conditions that are materially different from those contained in this Agreement. FRANCHISEE has no right to require that FRANCHISOR grant it similar terms and conditions.

J.   All persons owning, legally or beneficially, 30% or more of the stock in the FRANCHISEE, or any rights to acquire such amount of stock, must execute this Agreement.   FRANCHISOR represents and warrants that all such persons are set forth in Exhibit 1.   By executing this Agreement, such persons agree to be jointly and severally liable for all of FRANCHISEE's duties under this Agreement and any other agreements entered by the parties, and all amendments thereto.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement on the day and year first above written.

FRANCHISEE:                                      FRANCHISOR:  ColorAll TECHNOLOGIES
                                                 INTERNATIONAL, INC.

By: _____                      By: _____
Print: _____Michael MOHAN_____                   Title: _____Pres_____

The following persons join in this Agreement for the purpose of agreeing to be bound jointly and severally for all obligations of FRANCHISEE under this Agreement and any other agreements entered by the parties, including any amendments that may be made from time to time.

Signature: _____               Signature: _____

Name                                              Name

Signature: _____               Signature: _____

Name                                              Name

## CURRENT OWNERS OF FRANCHISEE

<u>Name</u>                                            <u>Percentage Ownership</u>

_Michael Mottau_                            _100_ %

_____            _____ %

_____            _____ %

_____            _____ %


There are no owners or persons with voting rights in FRANCHISEE other than as listed above.

# ASSUMPTION AGREEMENT

1.    In accordance with FRANCHISOR's written instructions, FRANCHISEE agrees to provide all Technical Franchisees in the Protected Territory with the following services (the "Administrative Services"):

      (a)    provide additional training;

      (b)    supervise, coordinate, and administer Technical-Franchisee operations;

      (c)    provide annual business planning;

      (d)    provide billing and collection services;

      (e)    on a weekly basis, pay each Technical Franchisee 60% of the billable work that it completed the previous week;

      (f)    ensure that all Technical Franchisees strictly comply with their franchise agreements; and

      (g)    use its best efforts to procure regular authorized customers for Technical Franchisees and annually increase the amount of business at least 10% of that for the preceding year for the first three years of the term of the Area Franchisee's Area Franchise Agreement.

2.    By agreeing to perform the Administrative Services, the Area Franchisee hereby assumes any obligation the Franchisor may owe Technical Franchisees to perform such Administrative Services. The Area Franchisee understands and agrees that it is exclusively responsible to Technical Franchisors for performing the Administrative Services.

Dated: _____12 - 14 - 00_____

AREA FRANCHISEE: _____

By: _____Michael Mollan_____
Print Name:

10. Section VIII, Paragraph A, add the following sentence at end of paragraph:

"*However, the monthly royalty fee is 7% of the gross sales in excess of $100,000 in any month.*"

11. Section VIII, Paragraph A, Item 2, Line 9:

Delete "120 days" and replace with "90 days".

12. Section XV, Paragraph B, Second Paragraph, add the following sentence at end of paragraph:

"If consent is rejected by Franchisor, transferee has 15 days to cure cause of rejection."

13. Section XV, Paragraph B, Third Paragraph, Line 6:

After "$2,500, add "*(but not to exceed $5,000)*"

14. Section XVI, Paragraph A, Sentence 1, Line 3:

Delete "180 days" and replace with "*1 year*"

15. Section XVI, Paragraph A, Item 2, Line 3:

Delete "180 days" and replace with "*1 year*"

16. Section XVI, Paragraph A, Item 2, Line 5:

Delete "180 days" and replace with "*1 year*"

17. Section XX, Paragraph F, Sentence 2, Line 3:

After "meeting", insert "*or conference call*"

18. Section XX, Paragraph F, Sentence 2, Line 4:

After "meeting", insert "*or conference call*"

19. Section XXI, Paragraph E, add the following sentence:

"*Further, Franchisor indemnifies the current Franchisee against any claims brought by the former Franchisee.*"

20. Section XXIV, Paragraph D, add the following sentence at the end of paragraph:

"*Further, Franchisee is indemnified against any claims brought by a Technical Franchisee against the Franchisor.*"

21. Section XXV, change Paragraph "D" to "D (i)".

22. Section XXV, insert new Paragraph D (ii) as follows:

"*(ii)   No failure of FRANCHISEE to exercise any power reserved to it under this Agreement, or to insist upon strict compliance by FRANCHISOR with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms of this Agreement, constitutes a waiver of FRANCHISEE's right to demand exact compliance with the terms of this Agreement.   If*

12/11/00 Mohan Amendment

*FRANCHISEE waives any particular default FRANCHISOR commits, such waiver is not binding unless in writing and executed by the party sought to be charged and will not affect or impair FRANCHISEE's right with respect to any subsequent default of the same or of a different nature. Nor may any delay, waiver, forbearance, or omission of FRANCHISEE to exercise any power or rights arising out of any breach or default by FRANCHISOR of any of the terms, provisions, or covenants hereof, affect or impair FRANCHISEE's rights nor will such constitute a waiver by FRANCHISEE of any right hereunder or of the right to declare any subsequent breach or default."*

All terms and conditions of the FRANCHISE Agreement not otherwise modified herein shall be maintained in full force and effect and are hereby ratified and affirmed. To the extent of any inconsistency between this Amendment and any of the other documents, this Amendment shall control.

This Amendment may be executed in counterparts by each of the parties hereto and each such document, when taken together, shall constitute a whole and be enforceable as one complete document.

IN WITNESS WHEREOF, the FRANCHISOR and FRANCHISEE has respectively signed and sealed this FRANCHISE AGREEMENT as of the day and year shown below.

_____          _____
Michael Mohan                              ColorAll Technologies International, Inc.

_____12-14-00_____                    _____12/15/00_____
Date                                       Date

_____          _____
Witness                                    Witness

_____          _____12/15/00_____
Date                                       Date

12/11/00 Mohan Amendment

(Cite as: 238 F.3d 413, 2000 WL 1853332 (4th Cir.(N.C.)))

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

Henry P. OSET, Plaintiff-Appellee,
v.
INTERSTATE BROKERAGE OF THE
SOUTHEAST, INCORPORATED, Defendant-
Appellant.
Henry P. OSET, Plaintiff-Appellant,
v.
INTERSTATE BROKERAGE OF THE
SOUTHEAST, INCORPORATED, Defendant-
Appellee.

Nos. 00-1029, 00-1109.

Argued Nov. 3, 2000.
Decided Dec. 19, 2000.

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, Chief District Judge. (CA-99-185-5-BO).

Margaret Cain Lumsden, Unti, Lumsden & Smith, P.A., Raleigh, NC, for appellant.

Steven Jay Vining, Glass & Vining, L.L.C., Cary, NC, for appellee.

ON BRIEF: Sharon L. Smith, Unti, Lumsden & Smith, P.A., Raleigh, NC, for appellant.

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

OPINION

PER CURIAM.

**1 Henry Oset sued Interstate Brokerage of the Southeast, Inc. (IBS), alleging violations of the North Carolina Business Opportunities Sales Act (BOSA) and Unfair and Deceptive Trade Practices Act (UDTPA). He sought a refund of the purchase price he paid under a licensing contract for a coffee service business. The district court entered summary judgment in favor of Oset and awarded him treble damages in the amount of $66,897. The court denied Oset's motion for attorneys' fees. We affirm these decisions.

I.

The essential facts are undisputed. In the winter of 1997-1998 Oset became interested in starting a business in Raleigh, North Carolina, because he and his family wanted to move there from New York. Oset learned that IBS, a franchise broker located in Florida, was offering business opportunities in North Carolina. In his first telephone conversation with an IBS representative, Oset learned that the business opportunity involved purchasing, locating sites for, and servicing automated espresso/cappuccino machines placed mainly in hotels and restaurants. Oset told IBS that he was interested in running a business only in the Raleigh area.

In March of 1998 IBS sent Oset written materials describing the business offering in greater detail. A letter introducing the materials said that IBS's business offering is "most profitable" and that its marketing techniques "generate[ ] excellent revenue potential." The materials described IBS's five-day training program in which IBS representatives offer investors "suggestions for acquiring accounts" and "personally assist the Purchaser in acquiring and installing their first five (5) machines." The materials illustrated various earnings scenarios. A disclaimer noted that there were no guarantees of income and that the earnings computations were not meant as forecasts of income.

On March 24, 1998, Oset submitted an application to IBS, indicating his exclusive interest in the Raleigh area. An IBS sales representative went to Oset's home in New York on March 26, 1998, where Oset and the representative signed a licensing contract. The contract stated that Raleigh was Oset's "area of primary responsibility." Oset paid IBS a total of $22,299, a purchase price of $18,799 and $3,500 for the training course.

An IBS representative gave Oset his training course

**(Cite as: 238 F.3d 413, 2000 WL 1853332 (4th Cir.(N.C.)))**

in Raleigh, and the company representative helped Oset find initial locations for the coffee machines. IBS sent all of the machinery and supplies that Oset needed to North Carolina. About two months into operations, Oset realized that the business was not as profitable as he believed IBS had suggested. Oset contacted George Fry, president of IBS, to request a refund, but Fry refused the request.

Oset then sought the assistance of the North Carolina Attorney General's office, which wrote IBS two letters stating that Oset was entitled to void the licensing contract because IBS had failed to comply with BOSA's disclosure and registration provisions. *See* N.C.Gen.Stat. § 66-100(a). The statute requires sellers of business opportunities to provide to purchasers a disclosure statement that conforms to the specifications laid out in BOSA. The disclosure statement, which is to be filed with the North Carolina Secretary of State, must contain certain information about the seller and suggest that purchasers should seek the advice of a lawyer before entering into the deal. *See* N.C.Gen.Stat. § § 66-95, 66-97. BOSA also mandates that business opportunity contracts inform the purchaser that the North Carolina Secretary of State has been designated as the seller's agent for service of process, as required by another provision of the statute. *See* N.C.Gen.Stat. § § 66-97, 66-99. In response to the Attorney General's letter, IBS did not dispute that it had not complied with BOSA. Instead, it asserted that North Carolina law did not apply. The Attorney General's office did not pursue the matter further.

**\*\*2** In February 1999 Oset filed a complaint against IBS in Wake County Superior Court, alleging violations of BOSA and UDTPA and seeking to void the licensing contract. Because there is diversity of citizenship, IBS removed the action to the Eastern District of North Carolina. IBS then moved to dismiss on the ground that neither BOSA nor UDTPA apply to a licensing contract entered into in New York. IBS also moved to strike two paragraphs of Oset's complaint, claiming that one of the paragraphs contains information that is the subject of privileged settlement negotiations and that the other inappropriately characterizes IBS's litigation position. Oset moved for summary judgment and for attorneys' fees.

The district court denied IBS's motion to dismiss, holding that IBS cannot rely on the rule that the law of the place of execution of a contract applies

because the complaint does not allege a breach of the licensing contract or raise a dispute about the meaning of its terms. Rather, the complaint alleges violations of BOSA and UDTPA occurring in North Carolina. The district court also denied IBS's motion to strike because Oset's complaint did not contain inappropriate or privileged information. The district court then granted Oset's motion for summary judgment, concluding that there was no dispute that IBS had sold Oset a "business opportunity" as defined by BOSA and that IBS had failed to comply with BOSA's registration and disclosure requirements. Oset was therefore awarded a refund of the contract price, the remedy provided for in BOSA. Because a violation of BOSA constitutes an unfair trade practice, the district court trebled Oset's damages under UDTPA. *See* N.C.Gen.Stat. § § 66-100(e), 75-16. The court denied Oset's motion for attorneys' fees, however, because Oset did not show that IBS's violations were willful or that its refusal to settle the matter was unwarranted. IBS appeals the denials of its motions to dismiss and to strike and the grant of Oset's motion for summary judgment. Oset appeals the denial of attorneys' fees.

II.

After reviewing the briefs and the joint appendix and considering the oral arguments of counsel, we are persuaded that the district court reached the correct result. Accordingly, we affirm substantially on the reasoning of the district court. *See Oset v. Interstate Brokerage of the Southeast, Inc.,* No. 5:99-CV-185-BO(2) (E.D.N.C. Nov. 30, 1999). [FN*]

> FN* IBS contends that it was not allowed to discover whether Oset made any profit in the coffee service business. Thus, IBS says that awarding Oset a refund of the contract price might result in unjust enrichment to him, in violation of BOSA. *See* N.C.Gen.Stat. § 66-100(a) ( "[The] purchaser shall not be entitled to unjust enrichment by exercising the remedies provided in this subsection."). We reject IBS's unjust enrichment argument. "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Am.Jur.2d Restitution and Implied Contracts* § 3 (1973). There is no suggestion that Oset did not return the machines and any unused

supplies to IBS. Under BOSA, therefore, Oset is "entitled to receive from the business opportunity seller [IBS] all sums paid to the business opportunity seller." N.C.Gen.Stat. § 66-100(a). BOSA's language does not indicate that IBS is entitled to an offset for any net earnings Oset might have realized from his work in the coffee service business.

*AFFIRMED.*

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Service: **Get by LEXSEE®**
Citation: **632 F2D 275**

*632 F.2d 271, \*; 1980 U.S. App. LEXIS 14328, \*\**

James Martin, Appellee, v. Pilot Industries, d/b/a Pro System, Inc. and Professional Auto Clean Systems; Arthur L. Crider, Jr., individually and as President of Pilot Industries, Inc.; Robert S. Hartzog, individually and as President of Pro System, Inc., Appellants, and Pro System, Inc., d/b/a Professional Auto Clean Systems; Professional Auto Clean Systems, Defendants

No. 79-1762

UNITED STATES COURT OF APPEALS, FOURTH CIRCUIT

632 F.2d 271; 1980 U.S. App. LEXIS 14328

June 3, 1980, Argued
September 4, 1980, Decided

## PRIOR HISTORY: [\*\*1]

Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem. Hiram H. Ward, District Judge.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, a corporation and its shareholders, appealed an order of the United States District for the Middle District of North Carolina, which found that defendants had violated the Business Opportunity Sales Act, N.C. Gen. Stat. § 66-94 et seq., when it sold a franchise to plaintiff buyer.

**OVERVIEW:** Plaintiff buyer executed an agreement with defendants, a corporation and its shareholders, to operate a franchise. Defendants expressly disavowed any guarantee of profits and because the contract contained an exclusionary clause, plaintiff brought an action alleging that defendants violated the Business Opportunity Sales Act (Act), N.C. Gen. Stat. § 66-94 et seq. The district court granted plaintiff's motion for summary judgment, but denied attorneys' fees. The court affirmed. Defendant's representations concerning gross sales and profits constituted a guarantee of income under § 66-94(3), but failed to comply with the Act's requirements. The court vacated the order with respect to defendant shareholders because the evidence was insufficient to impose personal liability. The denial of attorneys' fees was affirmed because plaintiff failed to demonstrate compensable injury.

**OUTCOME:** The court affirmed the judgment against defendants, a corporation and its shareholders, for violating the Business Opportunity Sales Act and the denial of attorneys' fees to plaintiff buyer. The order with respect to the liability of defendant shareholders was vacated for insufficient evidence.

**CORE TERMS:** seller, business opportunity, purchaser, summary judgment, franchise, Business Opportunity Sales Act, personal liability, disclosure, void, genuine issue, exclusionary clause, matter of law, alter ego, shareholders, buyer, promotional material, treble damages, disclaimer, personally liable, price paid, sums paid, machine, earning, corporate entity, purchase price, issue of fact, inappropriate, manifestation, actionable, ambiguous

**CORE CONCEPTS** - ♦ Hide Concepts

▤ Business & Corporate Entities : Franchises & Distributorships : Business Opportunities
⬆  See N.C. Gen. Stat. § 66-100(a).

▤ Business & Corporate Entities : Franchises & Distributorships : Business Opportunities
⬆  See N.C. Gen. Stat. § 66-94.

▤ Civil Procedure : Summary Judgment : Summary Judgment Standard
⬆ Summary judgment under Fed. R. Civ. P. 56 should be granted only when it is clear
   that no issue of fact is involved. Though the evidentiary facts are not disputed, if
   conflicting inferences could be drawn from those facts, summary judgment cannot be
   granted.

▤ Business & Corporate Entities : Shareholders & Other Constituents : Disregard of Corporate
Entity
⬆ In order to invoke the alter ego principle, it is necessary to demonstrate the presence
   of other factors justifying disregard of the corporate entity: undercapitalization of the
   corporation, failure to observe corporate formalities, or such domination of the
   finances, policies and practices that the controlled corporation is but a business conduit
   for its principal.

▤ Civil Procedure : Summary Judgment : Burdens of Production & Proof
⬆ As in all contexts, the party moving for summary judgment bears the burden of
   showing that there is no genuine issue as to any material fact and that he is entitled to
   a judgment as a matter of law. Fed. R. Civ. P. 56(c).

▤ Business & Corporate Entities : Franchises & Distributorships : Business Opportunities
⬆ N.C. Gen. Stat. § 66-100(b) provides that any purchaser injured by a violation of this
   article or by the business opportunity seller's breach of a contract subject to this article
   or any obligation arising therefrom may bring an action for recovery of damages,
   including reasonable attorneys' fees. To be entitled to attorneys' fees, plaintiff must
   demonstrate injury.

**COUNSEL:** Ronald A. Matamoros, Winston Salem, N. C. (Clyde C. Randolph, Jr., House,
Blanco & Randolph, P.A., Winston Salem, N. C., on brief), for appellants.

B. Ervin Brown, II, Winston Salem, N. C. (Stephens, Peed & Brown, Winston Salem, N. C., on
brief), for appellee.

**JUDGES:** Before WINTER, Circuit Judge, HARRY PHILLIPS, Senior Circuit Judge, Sixth Judicial
Circuit, sitting by designation, and PHILLIPS, Circuit Judge.

**OPINIONBY:** PHILLIPS

**OPINION: [*272]**


On their appeal in this diversity case under North Carolina law, defendants challenge the
district court's determination by summary judgment that both the corporate defendant, Pilot
Industries, Inc., and the individual defendants, Crider and Hartzog, failed to comply with North
Carolina's Business Opportunity Sales Act, N.C.Gen.Stat. §§ 66-94 to -100, when they sold a
business franchise to plaintiff James Martin. Concluding that the district court properly found

the corporation to have violated the Act, we affirm that part of the district court's judgment which imposed liability on **[\*273]** **[\*\*2]** Pilot Industries. We conclude, however, that the evidence adduced by plaintiff in support of his motion for summary judgment was insufficient to support the imposition of liability against the individual defendants.

I

Upon the summary judgment record we review, these undisputed material facts appear. In 1978, Pilot Industries, a South Carolina corporation, placed an advertisement in a Winston-Salem, North Carolina, newspaper, which read in part:

PROFESSIONAL AUTO CLEAN SYSTEMS

> If you are interested in owning your own profitable business we would like to talk to you. We're the people that provide a unique system for the professional clean-up and detailing of cars, trucks, and boats for new and used car dealers, fleets and individuals. We furnish a complete turn-key system including all specialized equipment, complete factory training and establishing of your accounts. We offer the opportunity for you to become financially independent with this program. If you're willing to work you'll be amazed at how successful your business will be in just a short time. Part-time earnings of $ 12,000 to $ 15,000 per year and full time earnings of $ 30,000 to $ 40,000 per year are projected with **[\*\*3]** our program. An investment of $ 8,500 to $ 12,500 depending on size and location of territory is required.

Martin responded to the advertisement and received promotional literature that made certain representations about potential profit, for example:

> GROSS SALES-The PRO System policy is to issue franchises only for locations which have been researched to insure minimum gross sales of $ 72,000 per year.PROFIT-It is PRO System's policy to survey, analyze and install each franchise operation to net 40 to 45% profit, before taxes, for the franchisee. Based on experience already gained and criteria established, if there are reasonable doubts about achievement, the proposed site and offer will be rejected.

The promotional materials made various claims about the training program, referred to the expected "substantial profit," and stated that the "complete set of tested practices and procedures . . . virtually makes your business into an exclusive money machine." Defendants also sent Martin a "profit projection" for the first year of operation which showed a projected net income of $ 25,670. In April 1978, Martin contracted with Pilot to operate a franchise in **[\*\*4]** Forsyth County, North Carolina. The contract contained an exclusionary clause stating that "no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect." Martin paid Pilot $ 12,000 at the time the contract was signed. In a "disclosure document" given to Martin prior to the signing of the contract and attached to it, Pilot expressly disavowed any guarantee of profit. Martin gave notice to Pilot that the contract was void and unsuccessfully demanded return of the $ 12,000.

Martin then brought suit alleging that defendants had violated both the Business Opportunity Sales Act and North Carolina's deceptive trade practices statute, N.C.Gen.Stat. § 75-1.1, and had breached the contract. Martin moved for summary judgment on the Business Opportunity Sales Act claim. The district court granted plaintiff's motion, holding that Pilot and the individual defendants were sellers of a business opportunity as defined by the statute,

N.C.Gen.Stat. § 66-94, and, therefore, subject to the Act's requirements; that defendants did not comply with the Act; and that both the corporation and the individual defendants **[**5]** were liable to Martin. The district court awarded Martin $ 12,172.82 n1 under the remedy provision found in § 66-100(a), n2 but **[*274]** declined to award attorneys' fees under § 66-100(b). The district court then determined that there was no just reason for delaying the entry of final judgment on the Business Opportunity Sales Act claim and directed the entry of judgment on that claim as provided for in Fed.R.Civ.P. 54(b).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1. Martin paid $ 172.82 in royalty payments to Pilot.

n2. ⚓N.C.Gen.Stat. § 66-100(a) provides:

If a business opportunity seller uses any untrue or misleading statements in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by G.S. 66-95, or fails to deliver the equipment, supplies or product(s) necessary to begin substantial operation of the business within 45 days of the delivery date stated in the business opportunity contract, or if the contract does not comply with the requirements of G.S. 66-99, then, within one year of the date of the contract, upon written notice to seller, the purchaser may void the contract and shall be entitled to receive from the business opportunity seller all sums paid to the business opportunity seller. Upon receipt of such sums, the purchaser shall make available to the seller at purchaser's address or at the places at which they are located at the time notice is given, all product(s), equipment or supplies received by the purchaser. Provided, that purchaser shall not be entitled to unjust enrichment by exercising the remedies provided in this subsection.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[**6]**

On this appeal defendants contend first, that the district court erred in ruling that, as a matter of law, the Business Opportunity Sales Act applied to the sale of the franchise and second, that, if the Act applied, the court erred in holding that defendants Crider and Hartzog were personally liable for violating the statute.

II

The Business Opportunity Sales Act was enacted by the North Carolina General Assembly in 1977 but has not been interpreted by North Carolina's appellate courts. Under the statute sellers of business opportunities, as defined in N.C.Gen.Stat. § 66-94, are required to make certain disclosures to the prospective buyer, id. § 66-95, to obtain a bond or trust account if certain representations are made to the buyer, id. § 66-96, and to file a disclosure statement with the Secretary of State. The seller may not make representations of the earning potential of the business opportunity "unless the seller has documented data to substantiate the claims," id. § 66-98(1). If the seller uses misleading statements or fails to make required disclosures, the buyer may, within one year of the date of the contract, give written notice to the seller that the contract **[**7]** is void and demand return of all sums paid to the seller. Id. § 66-100(a). Buyers that are "injured by a violation" of the statute may recover damages, including attorneys' fees. Id. § 66-100(b).

The critical question is whether defendants were sellers of a business opportunity and thus subject to the Act's requirements. ⚓"Business opportunity" is defined in § 66-94 as

the sale or lease of any products, equipment, supplies or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business, and in which the seller represents:(1) That the seller will provide locations or assist the purchaser in finding locations for the use or operation of vending machines, racks,

display cases or other similar devices, or currency-operated amusement machines or devices, on premises (neither) owned nor leased by the purchaser or seller; or (2) That it will purchase any or all products made, produced, fabricated, grown, bred or modified by the purchaser using in whole or in part, the supplies, services or chattels sold to the purchaser; or(3) The seller guarantees that the purchaser will derive income from the business opportunity **[\*\*8]** which exceeds the price paid for the business opportunity; or that the seller will refund all or part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller, if the purchaser is unsatisfied with the business opportunity; or(4) That upon payment by the purchaser of a fee or sum of money which exceeds fifty dollars (\$ 50.00) to the seller, the seller will provide a sales program or marketing program which will **[\*275]** enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity, provided that this subsection shall not apply to the sale of a marketing program made in conjunction with the licensing of a registered trademark or service mark.Provided, that "business opportunity" does not include the sale of an on-going business when the owner of that business sells and intends to sell only that one business opportunity; nor does it include the not-for-profit sale of sales demonstration equipment, materials, or samples, for a total price of one hundred dollars (\$ 100.00) or less.

The district court held that Pilot **[\*\*9]** Industries guaranteed income from the franchise and was, therefore, the seller of a business opportunity as defined in subsection (3).

Pilot argues that the representations made no guarantee of profit but instead offered an "opportunity" to make a profit and, therefore, summary judgment should have been granted in defendants' favor on the question of the statute's applicability. In support of its argument Pilot refers to statements in the promotional material that emphasize the necessity of substantial personal effort on the part of the buyer, the exclusionary clause in the contract, and the disclaimer of profit in the disclosure statement. Alternatively, defendants contend that the statements made are ambiguous so that summary judgment for either party was inappropriate. This, they urge, derives from a clear principle applied in contract interpretation cases that the meaning of an ambiguous writing presents an issue of fact that may not be resolved on summary judgment. The general principle is sound, see American Fidelity & Casualty Co. v. London & Edinburgh Insurance Co., 354 F.2d 214 (4th Cir. 1965), but it is inapposite here. We think the representations unambiguous in context **[\*\*10]** and summary judgment for Martin appropriate.

⚓Summary judgment under Fed.R.Civ.P. 56 should be granted only when it is clear that no issue of fact is involved. Though the evidentiary facts are not disputed, if conflicting inferences could be drawn from those facts, summary judgment cannot be granted. E.g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., 381 F.2d 245, 249 (4th Cir. 1967). Resolution of this issue requires, in the first place, a construction of the meaning of the critical words as they appear in the statute-obviously a question of law; then a determination whether the representations made fall within that meaning, which might or might not present a genuine issue of fact. There is no reason to interpret the words "guarantees" and "income" as used in this statute in other than their ordinary, plain meanings, and there is indeed no suggestion that they should be. It is also apparent to us, as it presumably was to the district court, that under the statute, whether particular representations do guarantee income must be assessed with reference to their objective manifestations rather than to any undisclosed subjective intentions of the person making them. While **[\*\*11]** the objective manifestation of particular words might present a genuine issue of fact due to their intrinsic or contextual ambiguity, we do not think that these do. Here both the express representations made and the context in which they were made are not in dispute, and we agree with the district court that as a matter of law they could convey to a reasonable person situated as was Martin but

one impression-that income was being guaranteed. On this basis, summary judgment was appropriately entered. See generally 10 C.Wright & A.Miller, Federal Practice & Procedure § 2725, at 507-16.

The representations made by Pilot, particularly the statements concerning gross sales and profits, which are quoted above, are guarantees of income under N.C. Gen.Stat. § 66-94(3). The Act clearly aims to regulate the kind of conduct involved here and to require the seller to document its profit claims. Pilot was, therefore, selling a business opportunity as defined in the Act and had to comply with the Act's requirements. Pilot's contention that the exclusionary clause and the disavowal of profit **[*276]** guarantee removed the sale from the Act's purview is unconvincing. The statute, as noted by **[**12]** the district judge, is not confined to regulating the behavior of the seller at the time the contract of sale is signed. Instead, the Act seeks to regulate precontract dealings as well. When Pilot made the statements concerning the expected profits, which constituted guarantees of income under § 66-94(3), it had to comply at that time with the Act's requirements. Pilot failed to do so by, for example, failing to obtain a bond, id. § 66-96, failing to present a financial disclosure statement to Martin before the signing of the sales contract, id. § 66-95(5), and failing to disclose the number of purchasers that had earned the amounts of income specified in the promotional material, id. § 66-95(10). The profit disclaimer in the statement attached to the contract and the exclusionary clause in the contract did not relieve Pilot from compliance with the statute. When Pilot guaranteed income from the franchise, it came within the statute's scope and had to comply with the Act in its dealings with Martin. Pilot could not then remove the sale of the franchise from the Act's requirements by later disclaiming any guarantee of profit. The purpose of the statute would be thwarted if a seller **[**13]** could avoid its application by making an eleventh hour disclaimer.

Because Pilot failed to make the statutorily required disclosures to Martin, Martin was entitled under § 66-100(a) to void the contract and receive all sums paid to Pilot. We therefore affirm the district court's entry of judgment against Pilot Industries.

III

We conclude, however, that the district court erred in granting summary judgment against and imposing personal liability on the individual defendants on the Business Opportunity Sales Act claim. The district court held Crider and Hartzog personally liable on two alternative theories. First, the court noted that Crider and Hartzog were the sole officers, incorporators, and shareholders of Pilot Industries; that Pilot never employed more than three other employees; and that Crider and Hartzog assisted in the preparation of the promotional material. On this evidence the court held that Pilot Industries was the "alter ego" of Crider and Hartzog. Second, the district court invoked the North Carolina rule that corporate officers may be liable for their tortious acts in the conduct of corporate business. We conclude that the evidence forecast for the court on the **[**14]** motion for summary judgment was insufficient to justify the imposition of personal liability on either theory.

North Carolina law, of course, recognizes that under some circumstances the corporate entity may properly be disregarded and personal liability imposed on shareholders of whom the corporation is the alter ego. E. g., Henderson v. Security Mortgage & Finance Co., 273 N.C. 253, 160 S.E.2d 39 (1968). However, as noted by the Henderson court, the mere fact that all of the stock of a corporation is owned by one or two shareholders is insufficient to justify attributing corporate acts to the shareholders and imposing personal liability on them. In Henderson the corporation was owned and operated by two people, but the critical factor in the alter ego determination was that, as testified by the corporate president, no effort was made to operate the corporation as an entity separate and distinct from his private interests. Id. at 260, 160 S.E.2d at 44. ✯In order to invoke the alter ego principle, it is thus necessary to demonstrate the presence of other factors justifying disregard of the corporate entity: undercapitalization of the corporation, failure to observe corporate formalities, **[**15]** or

such "domination of the finances, policies and practices that the controlled corporation is but a business conduit for its principal." R. Robinson, North Carolina Corporation Law and Practice § 2-12 (2d ed. 1974). See also id. §§ 9-8, -9.

As in all contexts, the party moving for summary judgment bears the burden of showing that there "is no genuine issue as to any material fact" and that he is "entitled to a judgment as a matter of law," **[\*277]** Fed.R.Civ.P. 56(c); see Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Viewing the alter ego theory evidence before the district court in the light most favorable to the individual defendants, we conclude that Martin failed to carry the burden of showing that no genuine issue of fact existed. It was not indisputably shown that defendants so dominated the finances and practices of Pilot Industries that the corporation had no separate existence, see Old Southern Life Insurance Co. v. Bank of North Carolina, 36 N.C.App. 18, 244 S.E.2d 264 (1978), that defendants had ignored corporate formalities, see Henderson v. Security **[\*\*16]** Mortgage & Finance Co., 273 N.C. at 260, 160 S.E.2d at 44, or that the corporation was undercapitalized, see Commonwealth Mutual Fire Insurance Co. v. Edwards, 124 N.C. 116, 120-21, 32 S.E. 404, 405-06 (1899). The imposition of personal liability against the individual defendants, therefore, cannot stand on this theory.

The district court also relied on a general rule of state law under which corporate officers may be held personally liable for their tortious acts committed in the course of conducting corporate business. We confess to finding the contours of the rule hazy. A leading commentator on North Carolina corporation law says of the rule that it is "subject to undefined exceptions in some cases where their tortious conduct was committed in good faith for the purpose of advancing the interests of the corporation." R. Robinson, North Carolina Corporation Law and Practice § 13-13 (2d ed.1974). Two North Carolina cases, Minnis v. Sharpe, 198 N.C. 364, 151 S.E. 735 (1930), and Lillian Knitting Mills Co. v. Earle, 237 N.C. 97, 74 S.E.2d 351 (1953), were cited by the district court, without further discussion, as authority for application of the rule to the instant case. We think **[\*\*17]** they do not provide the requisite authority. Whatever the exact scope of the rule, it clearly requires that the elements of an actionable tort be made out. Here the district court expressly ruled out the commission of any intentional tort when in ruling on plaintiff's motion for attorneys' fees it concluded that no willful violation of the Act had occurred. Neither is the statute one of those enacted to protect the public safety whose violation is treated as negligence per se, hence an actionable tort. n3 On appeal, Martin contends that the individual defendants' conduct constituted actionable fraud, but the elements of common law fraud simply cannot be held to have been established as a matter of law on the summary judgment materials before the district court. See Lillian Knitting Mills Co. v. Earle, 237 N.C. at 105, 74 S.E.2d at 356. Accordingly we conclude that summary judgment against the individual defendants on this theory was inappropriate.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3. E. g., Ratliff v. Duke Power Co., 268 N.C. 605, 151 S.E.2d 641 (1966). In any event, reliance on a theory of negligence per se would raise a difficult factual issue of causation that could not be resolved on summary judgment motion. See Bell v. Page, 271 N.C. 396, 156 S.E.2d 711 (1967).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[\*\*18]**

We conclude, therefore, that the district court erred in granting summary judgment against defendants Crider and Hartzog. It must therefore be vacated, and the action against the individual defendants remanded for further proceedings.

IV

Martin seeks attorneys' fees under N.C.Gen.Stat. § 66-100(b) for the prosecution of this appeal. The district court denied attorneys' fees for prosecution of the proceedings below, and Martin does not contest that denial on appeal. We think the district court's reasoning in denying attorneys' fees applies as well to justify their denial on appeal.

⚓Section 66-100(b) provides: "Any purchaser injured by a violation of this Article or by the business opportunity seller's breach of a contract subject to this Article or any obligation arising therefrom may bring an action for recovery of damages, including reasonable attorneys' fees." To be entitled to attorneys' fees, plaintiff must **[*278]** demonstrate "injury." At this stage plaintiff has shown entitlement to the restitutionary remedy found in § 66-100(a), but he has not, at this point, demonstrated compensable "injury." Because the Business Opportunities Sales Act has not been interpreted by **[**19]** the North Carolina courts, the district court relied on the statutory interpretation of similar language found in N.C.Gen.Stat. § 75-16, which grants treble damages to persons "injured" by violations of Chapter 75 of the statutes. In Hardy v. Toler, 288 N.C. 303, 218 S.E.2d 342 (1975), the North Carolina Supreme Court awarded treble damages to the purchaser of a used car that had been misrepresented by defendant-seller. In Taylor v. Triangle Porsche-Audi, Inc., 27 N.C.App. 711, 220 S.E.2d 806 (1975), also involving the sale of an automobile, the court distinguished Hardy and held that plaintiff was not entitled to treble damages because he sought to rescind the contract and recover the purchase price and was, therefore, not injured within the meaning of § 75-16. In Hardy plaintiff elected to retain the automobile and sue for the difference between the real and represented value. Martin, however, like plaintiff in Taylor, seeks to void the contract and recover the purchase price under § 66-100(a) and has not demonstrated "injury" as contemplated in § 66-100(b) that would entitle him to recover attorneys' fees. We think the district court's interpretation, drawing upon the state **[**20]** court's interpretation of a closely related statutory scheme, is soundly based and equally applicable to the claim for fees incident to appeal. They are accordingly denied.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Service: **Get by LEXSEE®**
Citation: **632 F2D 275**
View: Full
Date/Time: Friday, July 12, 2002 - 1:00 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.